**IN THE UNITED STATES DISTRICT COURT OF THE
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **LAUREN IVISON,** | § | |
| **individually,** | § | |
| | § | |
| | § | |
| | § | **CIVIL ACTION NO._____** |
| **v.** | § | |
| | § | |
| | § | |
| **EXTEND FERTILITY, LLC** | § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT AND REQUEST FOR A JURY TRIAL**</u>

## Table of Contents

I.   PARTIES ...................................................................................................... 2

II.  JURISDICTION AND VENUE ................................................................... 3

III. NATURE OF THE CASE ............................................................................ 4

IV.  FACTUAL ALLEGATIONS ...................................................................... 4

A.   Egg Retrieval ............................................................................................. 4

B.   Egg Storage and Transport ..................................................................... 12

C.   Egg Transfer and Thawing ..................................................................... 14

D.   The Process Irreparably Breaks Down.................................................. 16

E.   The Egg-Freezing Industry ..................................................................... 19

V.   FIRST CAUSE OF ACTION - NEGLIGENCE ...................................... 21

VI.  SECOND CAUSE OF ACTION - FRAUD AND DECEIT ........................ 22

VII. THIRD CAUSE OF ACTION - GROSS NEGLIGENCE........................... 24

VIII. FOURTH CAUSE OF ACTION - BREACH OF CONTRACT ............ 25

IX.  FIFTH CAUSE OF ACTION – MEDICAL MALPRACTICE................... 27

X.   SIXTH CAUSE OF ACTION - NEGLIGENT INFLICTION OF  EMOTIONAL DISTRESS........................................................................................................ 27

XI.  DAMAGES ................................................................................................ 28

XII. DEMAND FOR JURY TRIAL ................................................................ 29

XIII. PRAYER................................................................................................... 29

**TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:**

Plaintiff Lauren Ivison (Lauren), by and through the undersigned counsel, brings this Complaint against Defendant Extend Fertility, LLC, 200 West 57th Street #1101, New York, NY 10019 (Extend) and alleges as follows:

I.   **PARTIES**

1.      Plaintiff is over the age of eighteen and resident and citizen of Colorado.

2.      Defendant Extend Fertility, LLC is incorporated in Delaware as a limited liability corporation, doing business in New York with its principal place of business and offices located at 200 West 57th Street #1101, New York, NY 10019.

## II.      <u>JURISDICTION AND VENUE</u>

3.      The Court has original subject matter jurisdiction over this civil action as it is between citizens of different states and the amount in controversy exceeds $75,000, as required under 28 U.S.C. §1332.

4.      Venue is properly established in this Court pursuant to 28 U.S.C. §1391 as this is the judicial district in which Defendant Extend resides and where it is subject to the court's personal jurisdiction and also where a substantial part of the events or omissions giving rise to the claim occurred.

5.      The Defendant has done business in this State, has conducted or transacted business in this State, is licensed in this State, has committed one or more tortious acts within this State, has performed acts within this State giving rise to injuries and losses within this State, which acts subject Defendant to the jurisdiction of the court of this State.

6.      Defendant carried out its actions and conduct as more fully described below through its offices in this State, by authorized agents, servants and employees who were acting in the course and scope of their employment and authority, and in furtherance of the business and profits of the Defendant.

### III.   <u>NATURE OF THE CASE</u>

7.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligence, fraud, deceit and wrongful conduct in connection with the marketing, advertising, sale and provision of services relating to its oocyte cryopreservation, cryomanagement, cryogenic transport and storage services, also known as human female egg retrieval, freezing, preservation, storage, thawing and transfer for in vitro fertilization (IVF).[1]

8.      Unbeknownst to Plaintiff, Defendant operates without material oversight or regulation which allows it to bypass basic standards for the cryopreservation, cryomanagement, cryogenic transport of cryogenically preserved living human tissues.

9.      Defendant's conduct, as alleged in more detail below, was and is against public policy.

10.     Plaintiff's injuries were avoidable, and she brings this action on her behalf for her damages, but also to prevent others from experiencing the same fate.

### IV.   <u>FACTUAL ALLEGATIONS</u>

**A.  <u>Egg Retrieval</u>**

11.     Lauren Ivison always wanted to have children. But at the age of 38, when Lauren had not yet conceived, she began to worry about time.

12.     As the clock ticked down, Lauren began researching her options, options that would preserve the one of the most crucial decisions of her life.

13.     Lauren thoroughly researched the leading experts in egg freezing.

14.     Through their website, Lauren located Extend Fertility in New York City.

---

[1] In vitro fertilization is process of fertilization where an egg is combined with sperm outside the body, in vitro.

15.    Extend, according to their website, represented their services as "*the largest egg freezing practice in the nation*."[2]

16.    Extend also represented their expertise in the area of fertility. Extend employs Dr. Joshua Klein, a co-founder who Extend represents is a "*reproductive endocrinologist and fertility specialist*" from one the nation's leading fertility practices.[3]

17.    Lauren, relying on the representations made by Extend, traveled across the country to seek out the services of Extend because of their expertise, as well as their promises to practice "*Truth-Based Care*" and a commitment to her to "*unmask the facts and counsel women to confidentially address their fertility*."[4]

18.    Lauren's decision to proceed with the retrieval and freezing of her eggs at Extend was based in large measure on her understanding, through their representations, that Extend could help her successfully navigate one of the most important decisions of her life.

19.    Lauren at all times intended to use Extend to freeze and preserve her eggs, and then to transport her eggs to Colorado for thawing and IVF.

20.    Extend recognized the importance of the services they would be providing to Lauren, as well their role in changing her life: "*We believe that no one should fear what they don't know about their own fertility. We share a passion for delivering fertility in a more caring and transparent way. Because ultimately, what we do every day has the potential to change lives.*"[5]

---

[2] EXTEND FERTILITY, Provider Team, *available at* https://extendfertility.com/about-extend-fertility/#team (emphasis added) (last visited May 23, 2023).

[3] *Id.*

[4] *Id.*

[5] *Id.*

21.    Extend not only recognized the importance of their services but made representations to Lauren as to their expertise and their understanding of the significance of this life-changing process.

22.    Extend went further and made representations to Lauren and the public that their process was a superior process which had an almost perfect success rate. Extend represents they use an advanced "*Cryotec process*" that was "even *more* successful" than other forms of vitrification, "*increasing the egg survival rate to closer to 100%.  Think of it as the Rolls Royce of egg freezing methods.*"

23.    In describing their egg freezing process as a "*game changer for women,*" Extend convinced Lauren she would be getting the highest possible success rate and they would achieve "*our goal of 100% egg survival. No eggs left behind.*"

24.    Extend describes their egg freezing technique on their website, describing the scientific process called vitrification, where cells are rapidly cooled to a temperature of -196° Celsius, which is the equivalent of -320° Fahrenheit.[6]

25.    Extend relies on vitrification and the Cryotec method as "*the cornerstone*" of their lab.  Extend recognizes Dr. Masashige Kuwayama as the "foremost authority on egg vitrification." Extend represents that the Cryotec process "*consists of a specific set of strict protocols for egg cryopreservation…These protocols increase the egg survival rate to closer to 100%.*"[7]

---

[6] EXTEND FERTILITY, Egg Cryopreservation, *available at* www.Extendfertility.com/services/egg-freezing/cryopreservation/ (emphasis added) (last visited May 23, 2023). To vitrify is to convert a substance into a glasslike substance. Human oocytes contain a high content of water and during freezing, there is a risk that ice crystals will form in the cells, destroying their viability.  Rapid vitrification is intended to reduce the chance of ice crystal formation.

[7] *Id.*

26.     According to Extend's website, their lab has "*unique expertise in this cutting-edge method. The assistant director of our embryology lab, Dr. Leslie Ramirez, studied with Dr. Kuwayama to perfect her technique. Extend Fertility is Dr. Kuwayama's East Coast representative laboratory*."[8]

27.     Also, according to Extend's website, "*before any other cryogenic lab is permitted to use this method, their embryologists must train with Dr. Ramirez*."[9]

28.     With these representations and assurances in mind, Lauren put her trust in Extend, believing, as they had represented, that their "*clinical and laboratory excellence has always been at the forefront of Extend Fertility.*"

29.     By choosing Extend to retrieve and preserve her eggs, she relied on their specific representation: "*Our lab is led by highly experienced embryologist, scientists who specialize in human reproduction. We utilize vitrification or 'flash freezing' techniques for all egg and embryo freezing. Vitrification delivers superior thaw rates – 90% for eggs and nearly 100% for embryos frozen with this technique.*"[10]

30.     In late September 2018, Lauren flew to New York City to begin the egg retrieval process at Extend's offices.

31.      The egg retrieval protocol began on September 28 and lasted until October 12, a long, two-week process.

32.     On October 12, 2018, at the age of 39, Lauren underwent a successful egg retrieval and the doctor noted he had cryopreserved one "Big oocyte."

---

[8] *Id.* (emphasis added).

[9] *Id.* (emphasis added). Leslie Ramirez was the lab director at the time of Lauren's dealings with Extend. However, Dawn Kelk has since replaced Ramirez.

[10] EXTEND FERTILITY, Provider Team, *supra* note 2 (emphasis added).

33.    On January 12, 2019, Lauren once again returned to New York from Colorado to undergo a second egg retrieval, a process that again took two weeks.  This time, on January 25, 2019, Dr. Klein retrieved and cryopreserved two mature eggs.

34.    The Extend laboratory uses a Cryotec straw in the vitrification process. The Cryotec is a thin film strip attached to a rigid plastic handle. Extend stored Lauren's mature eggs, or oocytes on the film on the end of the Cryotec.[11]



*This is a photograph of the Cryotec wand.*

---

[11]YOUTUBE,          Protocol2020          English,          *available          at* https://www.youtube.com/watch?time_continue=135&v=XEy9zCKBRnU&feature=emb_logo (last visited Feb. 19, 2023).



*This photo identifies the blue plastic Cryotec handle (or straw) sitting in the tray of the vitrification plate which has three processing wells. On the far-right end of the Cryotec is a film or sheet upon which the oocytes are placed for vitrification.*



*This photo identifies a close-up of the film on the end the Cryotec, and a pipette dropping an oocyte or embryo onto the film.*

35.     After the oocytes are placed on the Cryotec, the technician submerges the film into liquid nitrogen, vitrifying the oocytes onto the film.



36.     The technician then manually screws a cap over the film on the end of the Cryotec straw.



37.     The lab technician places the Cryotec into a goblet, a plastic tube that holds multiple Cryotec straws. The goblet is then attached to long metal holder known as a cane.



*The cane, the straws and the goblet.*



*In this photo, the goblet is blue.*

38.     The cane is stored in a canister which is kept in a liquid nitrogen tank.



*In this photo, the technician is transferring the cane to the canister that fits inside the tank.*

39.     Extend keeps liquid nitrogen tanks containing the frozen oocytes in their lab, until they decide to transfer the frozen oocytes to NECC, their long-term storage facility partner. According to Extend's website, while in short term storage in their lab, these tanks have an alarm system and the staff "*monitors the status of each tank seven days a week, through daily visual inspection, to ensure the proper function of all equipment.*"[12]



*This photo shows actual liquid nitrogen storage tanks kept under a desk in Extend's lab.*

---

[12] EXTEND FERTILITY, Keeping Your Frozen Eggs Safe, *available at* https://extendfertility.com/keeping-your-frozen-eggs-safe/ (emphasis added) (last visited May 23, 2023).

## B.  Egg Storage and Transport

40.    In March of 2019, Lauren received an email from Extend notifying her that her retrieved eggs had been transferred from Extend's New York facilities, to their long-term storage facility at NECC in Massachusetts. The notice she received indicated: "*We are reaching out to you to notify you that your eggs are now being stored safely at Extend Fertility's long-term storage facility managed by New England Cryogenic Center, Inc. Your eggs are well cared for and protected by our state-of-the-art, FDA-registered storage facility.*"

41.    On its website, with the explicit recognition by Extend that "*a highly monitored, secure storage facility is imperative,*" as a part of the egg preservation process, Extend represents: "*That's why we've partnered with* **industry leaders** *in human tissue storage, New England Cryogenic Center in Massachusetts, for the long-term storage of eggs frozen at Extend Fertility.*"[13]

42.    Extend did not make long-term storage at NECC's facility a choice but operated in concert with NECC and established NECC as its long-term storage partner.

43.    Extend is solely responsible for the selection of NECC and partnership with the company in the egg transport and long-term storage.

44.    Extend represents this is because: "*We chose this transportation method for all eggs frozen with Extend Fertility because we have full trust in NECC team; NECC has sent and received over 100,000 shipments in the last 20 years, without incident.*"[14]

45.    According to Extend's website, NECC is "*one of the largest cryogenics storage sites in the world. Cryogenic storage is their* **sole** *focus and specialty, and they've been storing*

---

[13] EXTEND FERTILITY, Keeping Your Frozen Eggs Safe, *supra* note 12 (emphasis added).

[14] *Id.* (emphasis added).

*human tissues, including eggs and embryos, from all over the world for over 40 years without a single failure of any kind.*"[15]

46.     Extend further represents and describes NECC's process for egg preservation, which includes (1) automatic temperature maintenance, (2) constant monitoring, and (3) no susceptibility to power outages.[16]

47.     Extend guarantees that NECC is "*highly regulated*" as it is "*registered and governed by the FDA, licensed with appropriate regulatory agencies, and is regularly inspected by several entities. Their equipment, protocols, and standards exceed all federal and state regulations. Bottom line: NECC uses a highly tested, fail-safe inventory and storage system, and standards, which is why we have full trust in the safety and security of all frozen eggs stored there.*"[17]

48.     Also, according to their website, Extend does not use a third-party transport company. Extend uses NECC to transport all frozen eggs. "*NECC brings specialized travel tanks called "cryomovers" to Extend Fertility, fills them, and then takes the filled tanks to their facility.*" Once at NECC, "*the specimens are moved into large tanks following strict protocols. Only highly trained cryogenic professionals are involved in the process.*"[18]

49.     NECC, the company that provides transport services for Extend, represents their shipping services as follows: "*one of the world's leading cryogenic shipping specialists. Each year, thousands of clients and medical professionals turn to New England Cryogenic Center to*

---

[15] *Id.* (emphasis added).

[16] *Id.* (emphasis added).

[17] *Id.*  (emphasis added). NECC has a License from the Department of Health in MA under General Laws, Chapter 111D. NECC also has licenses from the New York State Department of Health as a Tissue Bank for Semen, testicular biopsies and epididymal aspirates, and oocytes and embryos.

[18] *Id.* (emphasis added).

*transfer cryogenically preserved material such as embryos, banked sperm, stem cells or other tissue from one location to another. Whether shipping across town or around the world, you can rely on New England Cryogenic Center's experience and our well-earned reputation for security, reliability and success. Cryogenic shipping is quite safe and secure.*"[19]



*This photo is from NECC's website: https://www.necryogenic.com/shipping-storage/*

50.      Lauren paid Extend for long-term storage of her eggs at NECC with the Spring 2019 Long-Term Storage Plan Renewal Form via credit card on May 8, 2019.

51.      With her eggs safely retrieved and preserved by Defendant, time was now on Lauren's side.

### C.  Egg Transfer and Thawing

52.      When Lauren determined it was the right time for her to begin her family, she began to research fertility specialists in Colorado.  Performing her due diligence, Lauren identified the local Colorado fertility specialist for her IVF process. Conceptions Reproductive Associates, Inc.

---

[19] NECRYOGENIC, Shipping Storage, *available at* https://www.necryogenic.com/shipping-storage/ (emphasis added) (last visited May 24, 2023).

in Colorado (Conceptions) formed in 1986, advertised its practice as having "*the honor of being among the highest successful birth rate both state- and nation-wide*."[20]

53.     In January of 2020, Lauren began seeing Dr. Greene at Conceptions to make plans for In-vitro fertilization (IVF). Conceptions' providers were advertised as "*some of the finest reproductive experts in the nations*."[21]

54.     Lauren then contacted Extend and advised them she would be requesting the transfer of her eggs to Conceptions in Colorado for thawing and IVF.

55.     Dr. Robert A. Green at Conceptions advised Lauren that Conceptions had worked through the interstate transfer process and confirmed all the necessary procedures and details: "*I met with lead embryologist Glenn Proctor today. We reviewed your case in detail. He has investigated Extend Fertility and agreed that we can accept your frozen oocytes as part of greater treatment plan*."

56.     At no point in time did Extend advise Lauren there was a problem with the quality of her eggs.  Extend did not warn Lauren that by transferring her eggs to Conceptions, there was an increased risk of any type in the process.

57.     Instead, Extend merely advised Lauren that she also had the option to go through IVF at Extend. Lauren received a response on February 28, 2020, from Jen Bernier, Director of Client Services (Bernier) who advised her that "*First I did want to ensure you know you can use your eggs with Extend! I forgot to mention that when we spoke on the phone!*"

---

[20] WFMZ.COM, *Conceptions Reproductive Associates of Colorado Announces Partnership with Automated Cell Management Platform TMRW* (Apr. 29, 2021), *available at* https://www.wfmz.com/news/pr_newswire/pr_newswire_business/conceptions-reproductive-associates-of-colorado-announces-partnership-with-automated-cell-management-platform-tmrw/article_ee29b548-7eb2-546e-bfed-91a90b37e470.html (last visited May 23, 2023).

[21] CONCEPTIONS, Providers, *available at* https://www.conceptionsrepro.com/fertility-doctors.html (emphasis added) (last visited Feb. 19, 2023).

58.     Lauren, however, preferred to go through the IVF process near her home.

59.     Extend sent Lauren a form and charged her for transporting her eggs to Conceptions in Colorado. Extend advised Lauren they would "*work together*" with Conceptions to ensure the safe transfer of her eggs.

60.     Bernier provided Lauren with a transfer-out consent form, specifically advising her to check: "*ALL oocytes,*" as well as advising her the cost would be $450. "*Once we have all your documents and your center you are working with is ready to accept the eggs we all work together with NECC to arrange the transfer.*"

61.     Lauren sent payment for the transfer of her three oocytes on March 4, 2020, by credit card to Extend. Lauren completed all the transfer and payment documents with Extend.

**D.   The Process Irreparably Breaks Down.**

62.     During the week of March 16, 2020, Lauren received a disturbing phone call from Conceptions.  They advised her Extend had only sent one of the straws which was identified as containing just one egg.

63.     After this phone call, Lauren immediately contacted Extend. She was advised that one of her two Cryotec straws had been misplaced by Extend.

64.     Extend then advised Lauren they had found the second straw at their New York facility. She was advised: "*We apologize for this! One straw was at Extend and the other was at NECC. Again our apologies.*"

65.     Extend agreed to send the second straw from the January 2019 retrieval to Conceptions.

66.     Extend then told Lauren they shipped the second straw to Conceptions for delivery on April 9, 2020.

67.     At no point did Extend advise Lauren that there were any issues or problems with the oocytes, the straw containing the oocytes, or the viability of the oocytes.

68.     On April 9, 2020, Conceptions received the shipment of the second straw. Conceptions confirmed receipt of the shipment but did not advise Lauren of any problems with the shipment.

69.     Conceptions would later indicate that one of the straws was missing its top.

70.     Upon information and belief, Conceptions delayed the thaw and fertilization due to the Pandemic.[22] Conceptions scheduled the thaw and fertilization procedure for May 28, 2020.

71.     The next call Lauren received changed her life forever.  On May 28, 2020, the Conceptions embryologist, Dr. Kim La Rocque, informed Lauren she had no useable oocytes.

72.     La Rocque advised Lauren that "*the tops to one of the straws was missing*."  She also told Lauren, of the three expected oocytes two "*weren't there*."  And the third oocyte had degenerated and not survived the thaw.

73.     Upon information and belief, La Rocque used the same thaw methodology for the thawing process as she had used at another clinic for 13 years. She said she "*was very familiar with it. She has no idea what happened. She said they just weren't there*."

74.     According to Lauren's medical records from Conceptions recorded by K. LaRocque: "*The first cryotop[23] was labeled to contain 1 oocyte. Nothing was present on this cryotop. Second embryologist searched dish. The second cryotop was labeled to contain 2 oocytes.*

---

[22] New York's stay-at-home order was issued March 22, 2020.  Colorado's stay-at-home order was issued March 26, 2020.

[23] Cryotop is a tradename for another type of vitrification straw (also a plastic wand with a flat blade) manufactured by Kitizato in Japan.  The Cryotec vitrification straw is a tradename of Cryoteclabs developed by Dr. Masashige Kuwayama in 2011. Kuwayama also appears to have developed the Cryotop method in 2000. https://www.emedevents.com/speaker-profile/masashige-kuwayama

*There was one oocyte on this cryotop. Second embryologist searched dish. Unfortunately, this oocyte did not survive the warming process.*"

75.     Lauren had no viable oocytes for IVF. She also had no explanation of why two of her three oocytes were missing.

76.     Egg retrieval is a demanding process for a woman.  Lauren put her full faith and trust in Defendant to live up to the representations made concerning their services.  She relied on them for their expertise and on their claims to superior results.  Lauren's eggs were lost due to causes that Defendant have not been able to explain. These losses will always weigh on Lauren's mind.  It's impossible for Lauren to forget that a part of her was lost, along with an opportunity to carry and give birth to her own biological child. Lauren does not want anyone else to experience what she has gone through.

77.     The loss of Lauren's oocytes has caused her substantial physical and emotional pain, distress and suffering.

78.     As a result of the emotional distress caused by this ordeal, Lauren and her partner ended their relationship.

79.     In addition to these losses, Lauren has spent significant funds in an effort to achieve a pregnancy. Extend advertises its costs as $6,500 for the first cycle and $5,500 for additional cycles.[24] Her out-of-pocket expenditures also included medications, travel and hotels and lost time at work. She also incurred expenses for the services at Conceptions, including the unsuccessful thaw.

---

[24] EXTEND FERTILITY, *Pricing*, *available at* https://extendfertility.com/pricing/ (emphasis added) (last visited Feb. 19, 2023).

80.     Following the unsuccessful thaw, Lauren incurred additional expenses to become pregnant through the use of a donor egg.

**E.  The Egg-Freezing Industry**

81.     The egg freezing industry has emerged as a multi-billion-dollar industry. The industry has experienced staggering financial growth with large infusions of venture capital money. Yet, cryomanagement accountability and control practices have not been implemented to manage this growth. Although the labs are handling invaluable human cells, most of the industry uses antiquated manual labeling, identification, record keeping and tracking systems. The industry remains virtually unregulated, putting women, families, and the public at risk.

82.     Based upon information and belief, Extend was founded in 2016, funded by private equity funds to build a syndicate of fertility clinics. Extend spins its story as "*founded on the premise that democratizing egg freezing could ultimately change the fertility industry*." In truth, the intent appears to be the monetization of women's fertility.

83.     Extend's pitch is "*disrupting the way fertility treatment has traditionally been provided*."  This means the expansion of their egg freezing model to additional geographic markets.

84.     Extend and similar facilities encourage women to freeze their eggs, not out of medical necessity, but simply as a matter of convenience, and assure their clients of their security in the process.

85.     Cryopreservation—and all of the repeated manual steps after retrieval to IVF— virtually guarantees human error. Variation within the procedures and between technicians, labs

and programs also means there is an inherent lack of reliability and accountability. There are no cameras, no recordings, and virtually no paperwork.[25]

86.    After retrieval, a woman has no means of tracking or identifying her own eggs.

87.    Extend uses novel thin-film, supercooling procedures in an open-system utilizing a plastic wand with a flat blade device called a Cryotec. Yet, open-blade methods are subject to technical variation and expose the system to flaws and human error that present quality control issues and the opportunity for failure.

88.    Storage and transfer of the open blade Cryotec has been reported to create the added risk of failure.

89.    Yet, Extend is relying on marketing that touts virtually a 100% success rate, declaring:



90.    While cryomanagement is expanding, cryomanagement practices have not evolved to keep up with this growth. Technology, record keeping, management and oversight has not been standardized, regulated, or required. Errors are likely to continue unless the industry is held responsible and Extend, in this case, accountable.

---

[25] When Lauren requested all documentation from her egg storage at NECC, the facility responded they had no records.

## V.  __FIRST CAUSE OF ACTION - NEGLIGENCE__

91.    Plaintiff re-alleges each and every allegation of this Complaint.

92.    Extend had a duty to the Plaintiff to exercise reasonable care in its representations, marketing, supply, sale, and provision of its products and services; Defendant breached this duty and the breach of that duty constituted a proximate cause of Plaintiff's injuries.

93.    Defendant's negligence included, but was not limited to, the following:

a)  Failing to safeguard Lauren Ivison's frozen eggs.

b)  Failing to properly label and store Lauren Ivison's frozen eggs.

c)  Failing to implement strict safe and secure cryomanagement practices for the preservation and use of frozen eggs.

b)  Failing to implement and follow strict safe and secure practices and protocols for handling and transporting frozen eggs.

c)  Failing to ensure the secure transportation of frozen eggs from their facility to another facility under conditions and oversight that protected the viability of the frozen eggs.

d)  Failing to provide for a system of identification to preserve the chain-of-custody of frozen eggs.

e)  Failing to provide for a system to transport the oocytes from Extend to NECC and NECC/Extend to Conceptions, ensuring the necessary precautions were taken so that the oocytes would be property preserved.

f)  Failing to promulgate rules and procedures for the proper handling and labeling of frozen eggs.

g)  Utilizing a specialized vitrification process that required expertise and training for the thawing process without ensuring that Conceptions could thaw eggs using this specialized process.

h)  Misrepresenting the success rate of frozen egg survivability.

i)  Relying on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

j)  Failing to implement software and hardware technology to store, trace and maintain frozen eggs.

k) Failing to ensure that frozen eggs are only transferred to trained and qualified labs who can thaw eggs from Extend pursuant to the requisite specialized procedures.

l) Misrepresenting and falsely advertising the nature and quality of Defendant's services and the terms and conditions on which services are performed.

m) Failing to warn Lauren of the dangers inherent in egg transport.

n) Generally using unreasonable, careless, and negligent conduct in the sale and performance of its services.

94.     As a direct and proximate result of the carelessness and negligence of Extend as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

95.     Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

## VI.     SECOND CAUSE OF ACTION - FRAUD AND DECEIT

96.     Plaintiff re-alleges each and every allegation of this Complaint.

97.     Extend misrepresented its practices and protocols for handling living cells. Extend fraudulently induced Lauren into entering into a contractual relationship by misrepresenting their services.

98.     Defendant knowingly made false and fraudulent statements of material fact concerning the nature and quality of their services and the terms and conditions on which these services were performed. Defendant intended to induce Plaintiff, as well the general public, to rely on these statements and misrepresentations; Plaintiff's reliance on these statements and misrepresentations was justifiable and the Defendant is liable for the harm and damage caused to Plaintiff.

99.     Defendant's false and fraudulent statements or omissions of material fact, as fully identified above in the factual allegations, included, but were not limited to, the following:

a) Falsely representing Defendant's ability to safeguard Lauren Ivison's frozen eggs.

b) Falsely representing Defendant's cryomanagement services for the preservation and use of frozen eggs.

c) Falsely representing Defendant's cryomanagement services for handling and transport of frozen eggs.

d) Falsely representing Defendant's maintained a secure system of identification to preserve the chain-of-custody of frozen eggs.

e) Falsely representing Defendant's services included providing for a safe system to transport the oocytes from Extend to another lab that ensured the necessary precautions were taken so that the oocytes would be property preserved.

f) Falsely representing Defendant maintained precautions necessary to ensure Lauren's frozen eggs were preserved during transport to Conceptions.

g) Falsely representing success and survivability rates for frozen eggs.

h) Falsely representing the success rate of the Cryotec vitrification process.

i) Falsely representing Defendant operated under rules and procedures for the proper handling and labeling of frozen eggs.

j) Falsely representing frozen eggs could be safely and securely transported to another laboratory for thawing.

k) Falsely representing that Defendant could safely and securely transport Plaintiff's frozen eggs to Colorado for thawing.

l) Failing to disclose the material fact that Defendant relied on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

m) Failing to disclose the material fact that Defendant had not implemented software and hardware technology to store, trace and maintain frozen eggs.

n) Failing to disclose to Plaintiff the material fact that it could only transfer her frozen eggs to trained and qualified laboratories that were trained in de-vitrification or thawing eggs pursuant to Cryotec's thawing process.

o) Misrepresenting and falsely advertising the nature and quality of Defendant's services and the terms and conditions on which services are performed.

p) Failing to warn Lauren of the dangers of egg transport.

100.    As a direct and proximate result of the carelessness and negligence of Defendant as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

101.    Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

### VII.    THIRD CAUSE OF ACTION - GROSS NEGLIGENCE

102.    Plaintiff re-alleges each and every allegation of this Complaint.

103.    Defendant had a duty to the Plaintiff to exercise reasonable care in their representations, marketing, supply, sale, and provision of its products and services; Defendant breached this duty and the breach of that duty constituted a proximate cause of Plaintiff's injuries.

104.    Defendant's breach of duty was more than a mere failure to exercise reasonable care. It was a failure to exercise even slight care. Defendant's self-serving conduct evinces a reckless indifference to the rights of others.

105.    Defendant's gross negligence included, but was not limited to, the following:

a)  Failing to safeguard Lauren Ivison's frozen eggs.

b)  Failing to properly label and store Lauren Ivison's frozen eggs.

c)  Failing to implement strict safe and secure cryomanagement practices for the preservation and use of frozen eggs.

d)  Failing to implement and follow strict safe and secure practices and protocols for handling and transporting frozen eggs.

e)  Failing to ensure the secure transportation of frozen eggs from their facility to another facility under conditions and oversight that protected the viability of the frozen eggs.

f)  Failing to provide for a system of identification to preserve the chain-of-custody of frozen eggs.

g)  Failing to provide for a system to transport the oocytes from NECC to Extend and Extend/NECC to Conceptions, ensuring the necessary precautions were taken so that the oocytes would be property preserved.

h)  Failing to promulgate rules and procedures for the proper handling and labeling of frozen eggs.

i)  Utilizing a specialized vitrification process that required expertise and training for the thawing process without ensuring that Conceptions could thaw eggs using this specialized process.

j)  Misrepresenting the success rate of frozen egg survivability.

k)  Relying on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

l)  Failing to implement software and hardware technology to store, trace and maintain frozen eggs.

m) Failing to ensure that frozen eggs are only transferred to trained and qualified labs who can thaw eggs from Extend pursuant to the requisite specialized procedures.

n)  Misrepresenting and falsely advertising the nature and quality of Defendant's services and the terms and conditions on which services are performed.

o)  Failing to warn Lauren of the dangers of egg transport.

106.    As a direct and proximate result of the gross negligence of Defendant as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

107.    Plaintiff requests judgment against Defendant for a reasonable amount plus punitive damages, statutory interest and costs, and for such other relief as shall be appropriate.

### VIII.   FOURTH CAUSE OF ACTION - BREACH OF CONTRACT

108.    Plaintiff re-alleges each and every allegation of this Complaint.

109.    Extend breached its contract with Lauren by failing to provide the services it represented.

110.    Defendant breached its contract with Plaintiff by making warranties and promises it could not or would not keep, as fully identified above in the factual allegations, included, but were not limited to, the following:

a)  Falsely representing Defendant's ability to safeguard Lauren Ivison's frozen eggs.

b)  Falsely representing Defendant's cryomanagement services for the preservation and use of frozen eggs.

c)  Falsely representing Defendant's cryomanagement services for handling and transport of frozen eggs.

d)  Falsely representing Defendant's maintained a secure system of identification to preserve the chain-of-custody of frozen eggs.

e)  Falsely representing Defendant's services included providing for a safe system to transport the oocytes from Extend to another lab that ensured the necessary precautions were taken so that the oocytes would be property preserved.

f)  Falsely representing Defendant maintained precautions necessary to ensure Lauren's frozen eggs were preserved during transport to Conceptions.

g)  Falsely representing success and survivability rates for frozen eggs.

h)  Falsely representing the success rate of the Cryotec vitrification process.

i)  Falsely representing Defendant operated under rules and procedures for the proper handling and labeling of frozen eggs.

j)  Falsely representing frozen eggs could be safely and securely transported to another laboratory for thawing.

k)  Falsely representing to Plaintiff that Conceptions could safely and securely thaw her frozen eggs.

l)  Failing to disclose the material fact that Defendant relied on antiquated manual systems for labeling, tracking, storing, and transporting frozen eggs.

m) Failing to disclose the material fact that Defendant had not implemented software and hardware technology to store, trace and maintain frozen eggs.

n)  Failing to disclose the material fact that Lauren's frozen eggs could only be transferred to trained and qualified laboratories that were training in de-vitrification or thawing eggs pursuant to the Cryotec's thawing process.

o)  Misrepresenting and falsely advertising the nature and quality of Defendant's services and the terms and conditions on which services are performed.

111.   As a direct and proximate result of Defendant's breach of contract and express warranties as set forth above, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

112.   Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

### IX.    FIFTH CAUSE OF ACTION – MEDICAL MALPRACTICE

113.   Plaintiff re-alleges each and every allegation of this Complaint.

114.   Lauren sought professional medical care from Extend. Extend represented that it and its agents, employees, contractors, and assigns were competent to perform and render the medical care, treatment, services, and advice sought by Lauren.

115.   Extend rendered medical care, treatment, and services, to Lauren including medical consultations, medically preparing Lauren's body for egg retrieval, and performing the egg retrieval and preservation processes.

116.   Extend's medical care of Lauren, including consultation, services, and retrieval and preservation processes, was rendered carelessly, unskillfully, negligently, and not in accordance with accepted standards of medical care.

117.   Because of Extend's conduct, Plaintiff suffered severe and permanent injuries, including physical pain, emotional distress and monetary damages.

118.   Plaintiff requests judgment against Defendant for a reasonable amount plus statutory interest and costs and for such other relief as shall be appropriate.

### X.    SIXTH CAUSE OF ACTION - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

119.   Plaintiff re-alleges each and every allegation of this Complaint.

120.    Extend had a duty to the Plaintiff to exercise reasonable care in its representations, marketing, supply, sale, and provision of its products and services. Extend breached this duty as described above and the breach of that duty constituted a proximate cause of Plaintiff's injuries.

121.    Specifically, Plaintiff suffered emotional distress as a result of Defendant's breach, which resulted in physical trauma separate and apart from what was required for the egg retrieval procedures.

122.    Extend's negligence further endangered Lauren's physical safety by enticing her to physically undergo egg retrieval preparation and procedures that she otherwise would not have done.

## XI.    DAMAGES

101. Based on the foregoing, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action, for general and special damages, for the costs expended herein, and for such other and further relief, both at law and in equity, to which Plaintiff may show herself justly entitled, including, as follows:

a. Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action.

b. Compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss.

c. Economic damages in the form of medical expenses, out of pocket expenses, travel and transportation expenses, lost earnings and other economic damages in an amount to be determined at trial of this action.

d. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless actions of the Defendant which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and to deter future similar conduct, to the extent allowed by applicable law.

e. Pre-judgment interest at the maximum rate allowed by law.

f. Post-judgment interest at the maximum rate allowed by law.

g. Such other and further relief as this Court deems just and proper.

## XII.   DEMAND FOR JURY TRIAL

102.  Plaintiff hereby demands a trial by jury as to all issues.

## XIII.   PRAYER

103.    Based on the foregoing, Plaintiff demands judgment against the Defendant for general damages, special damages, for the costs expended herein, for prejudgment interest from the date of the injury through judgment, and post-judgment interest on the judgement at the maximum rate allowed by law, and for such other and further relief, both at law and in equity, to which Plaintiff may show herself to be justly entitled.

**Dated: May 30, 2023**

Respectfully submitted,
HENDLER FLORES LAW, PLLC

Scott M. Hendler
*Admission Pro Hac Vice Pending*
Texas Bar No. 9445500
shendler@hendlerlaw.com
Leigh A. Joseph
*Admission Pro Hac Vice Pending*
Texas Bar No. 24060051
ljoseph@hendlerlaw.com
901 S. MoPac Expressway
Bldg. 1, Suite #300
Austin, Texas 78746
Telephone: (512) 439-3200
Facsimile: (512) 439-3201
***ATTORNEYS FOR PLAINTIFF***