UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
LAUREN IVISON,                          :
                      Plaintiff,        :
                                        :      23cv4503 (DLC)
            -v-                         :
                                        :      OPINION AND
EXTEND FERTILITY, LLC.,                 :         ORDER
                      Defendant.        :
                                        :
--------------------------------------- X

APPEARANCES:

For plaintiff Lauren Ivison:
Scott Martin Hendler, I
Stephen Daniel Demik
Leigh Joseph
Hendler Flores Law, PLLC
901 S. MoPac Expressway
Building 1, Suite 300
Austin, TX 78746

For defendant Extend Fertility, LLC:
Mark Frank McAndrew
Brian D. Meisner
Voute, Lohrfink, McAndrew, Meisner & Roberts
170 Hamilton Ave, Suite 315
White Plains, NY 10601

DENISE COTE, District Judge:

Plaintiff Lauren Ivison has brought an action against defendant Extend Fertility, LLC. ("Extend") alleging various state law claims. Extend moves, pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7), Fed. R. Civ. P., to dismiss the complaint. For the following reasons, the motion is granted in part.

**Background**

The following facts are taken from the complaint.  For the purposes of deciding this motion, the complaint's factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor.

Plaintiff, a resident of Colorado, began researching options to freeze her eggs in 2018, when she was 38.  After researching the leading experts in egg freezing, she decided to use the services of Extend, a fertility clinic located in New York City.  Ivison made this decision based on Extend's representations on its website that it was "the largest egg freezing practice in the nation," and employed experts in reproductive endocrinology and fertility.  Ivison relied on Extend's further representations that it uses an advanced "Cryotec Process," which it stated on its website "consists of a specific set of strict protocols for egg cryopreservation [which] increase the egg survival rate closer to 100%."  According to Extend's website, the Cryotec process relies on rapidly cooling cells to a temperature of -196 degrees Celsius, a process known as vitrification, which the website stated "delivers superior thaw rates -- 90% for eggs and nearly 100% for embryos."  Extend's website stated that its assistant director had studied with the "foremost authority on egg vitrification."  Because of Extend's representations, Ivison

2

believed she could rely on them to safely retrieve, store, care for, and transport her eggs.

In late September 2018, Ivison travelled to New York to undergo the egg retrieval process with Extend. Her plan was to use Extend's services for freezing, storing, and eventually transporting her eggs to Colorado for thawing and in vitro fertilization ("IVF"). An egg retrieval cycle involves a 1-2 week process, during which the patient takes medication to stimulate the ovaries to produce multiple eggs. The process also involves multiple blood tests and transvaginal ultrasound exams. A physician determines when the eggs are ready for retrieval, at which point they are surgically removed. After the eggs are removed, Extend places them on a Cryotec straw, a thin film strip attached to a rigid plastic handle. A lab technician submerges the straw in liquid nitrogen, which freezes the eggs onto the film. The technician then manually screws a cap over the film on the end of the straw, places the straw into a tube, and stores the tube in a canister inside a liquid nitrogen tank.

Extend keeps the liquid nitrogen tanks in its lab until it decides to send them to its long-term storage facility partner. Extend's website states that while the eggs are in short term storage in its lab, the tanks have an alarm system and the staff

"monitors the status of each tank seven days a week, through daily visual inspection, to ensure the proper function of all equipment."  Its website further states that because "a highly monitored, secure storage facility is imperative . . . we've partnered with industry leaders in human tissue storage, New England Cryogenic Center in Massachusetts ["NECC"], for the long-term storage of eggs frozen at Extend Fertility."  Storage at NECC is the only option for long-term storage of eggs retrieved by Extend.  Extend's website states that it chose NECC because "NECC has sent and received over 100,000 shipments in the last 20 years, without incident" and that NECC has "been storing human tissues, including eggs and embryos, from all over the world for over 40 years without a single failure of any kind."  Ivison relied on these representations when she chose to use Extend's services.

Ivison began her first egg retrieval cycle on September 28, 2018, and underwent a successful egg retrieval on October 12; the doctor noted he had cryopreserved one oocyte.  On January 12, 2019, Ivison returned to New York from Colorado to undergo a second egg retrieval; on January 25, her doctor retrieved and cryopreserved two oocytes.

Before beginning her first cycle, Ivison signed an

"Informed Consent" form ("Consent Form") which explained the

procedure and noted that

> Freezing my eggs does not provide a guarantee that the
> eggs, once thawed, will result in an embryo or a
> viable pregnancy.  There is a risk that, should I
> choose to use my eggs in order to become pregnant,
> none of my eggs will survive the thawing procedure,
> fertilize normally, or develop into embryos.

The form also stated that

> At the time I sign this Consent, I must also elect a
> long term storage plan by signing a separate agreement
> (the 'Long Term Storage Agreement') for how my frozen
> eggs w[ill] be stored after the Initial Storage Period
> . . . . If and when I choose, I may authorize Extend
> Fertility, LLC to release my frozen eggs to a licensed
> physician or clinic designated by me, in accordance
> with my signed written authorization.

Finally, the form contained a provision purporting to limit

Extend's liability:

> I hereby agree to indemnify, hold harmless, not sue,
> and release the Extend Fertility Medical Practice and
> its physicians, employees, and contractors, and Extend
> Fertility LLC, and its officers, directors, trustees,
> employees, and agents from any and all liability or
> obligation of any kind whatsoever in any way connected
> with or related to my participation in this egg
> retrieval/freezing process.  This includes but is not
> limited to claims relating to: 1) failure to obtain
> viable eggs; (2) failure of the frozen eggs to survive
> freezing or thawing or to fertilize when thawed; (3)
> failure to become pregnant; (4) pregnancy with
> subsequent miscarriage; (5) complications of pregnancy
> or labor and delivery; (6) disease or abnormalities
> afflicting any children born as a result of this
> process; or (7) any claim or legal action whatsoever
> brought by an assignee or heir.

> I understand that in the event of the loss, injury,
> damage or destruction of my eggs by the failure to
> exercise reasonable care by Extend Fertility Medical
> Practice and its physicians, employees, and
> contractors, and/or Extend Fertility LLC, and any of
> its officers, directors, trustees, employees, or
> agents, the total <u>liability</u> of Extend Fertility
> Medical Practice <u>shall be the amount equal to the
> total fees paid</u> to Extend Fertility Medical Practices
> and the total liability of Extend Fertility, LLC shall
> be the amount equal to the total fees paid to Extend
> Fertility, LLC.[1]

(emphasis supplied).  In March 2019, Ivison received an email from Extend notifying her that her eggs had been transferred from Extend to the NECC facility in Massachusetts.  Ivison paid Extend for long-term storage of her eggs at NECC on May 8, 2019.

In January of 2020, Ivison began seeing a doctor at a Colorado fertility clinic, Conceptions Reproductive Associates, Inc. ("Conceptions"), to make plans for IVF.  Ivison contacted Extend to request the transfer of her eggs to Conceptions in Colorado for thawing and IVF.  Her doctor at Conceptions advised her that Conceptions had worked through the interstate transfer process and confirmed all the necessary procedures and details, noting that he had met with the clinic's lead embryologist, who had investigated Extend "and agreed that we can accept your frozen oocytes as part of greater treatment plan."

---

[1] The record does not include a Consent Form for the second retrieval process.

Extend sent Ivison a form and charged her for transportation of her eggs to Conceptions, advising her that they would "work together" with Conceptions to ensure the safe transfer of her eggs.  Ivison completed the transfer documents and paid Extend on March 4, 2020.

During the week of March 16, 2020, Conceptions called Ivison and informed her that Extend had sent only one of the two Cryotec straws, which Conceptions identified as containing just one egg.  Ivison immediately contacted Extend, and was told that one of her two Cryotec straws had been misplaced by Extend.  She was then told that Extend had found the second straw at its New York facility, and agreed to ship it to Conceptions, where it arrived on April 9, 2020.  Due to the pandemic, the thaw and fertilization procedure was delayed until May 28, 2020.  On that date, the embryologist at Conceptions told Ivison that she had no usable oocytes.  The embryologist informed Ivison that the cap of one of the straws was missing, and of the three expected oocytes, two simply "weren't there."  The embryologist used the same thawing process she had used at another clinic for 13 years, and said she "was very familiar with it," but had "no idea what happened," and said the eggs "just weren't there." The one egg had degenerated during the thawing process.

Ivison's medical records from Conceptions note that the first straw

> was labeled to contain 1 oocyte.  Nothing was present on this [straw].  Second embryologist searched dish. The second [straw] was labeled to contain 2 oocytes. There was one oocyte on this [straw].  Second embryologist searched dish.  Unfortunately, this oocyte did not survive the warming process.

Extend never advised Ivison that there were any issues or problems with the oocytes, the straw containing the oocytes, or the viability of the oocytes.  It has not explained why two of the three oocytes were missing, or why one of the straws arrived with no cap.  When Ivison requested documentation from NECC, the facility responded that they had no record of her egg storage.

The parties initially attempted to resolve their dispute out of court.  Plaintiff's counsel drafted, and Extend's counsel signed, a series of tolling agreements between December 2021 and January 2023.

Ivison filed her complaint on May 30, 2023.  Extend filed a motion to dismiss the original complaint, and Ivison filed the First Amended Complaint ("FAC") on August 18.

The FAC includes six counts: negligence, medical malpractice (styled as "medical negligence"), fraud, gross negligence, breach of contract, and negligent infliction of emotional distress.  The FAC alleges various economic and non-economic damages, including pain, suffering, and emotional

distress.  In addition to the over $10,000 that Ivison paid to Extend for the two retrieval cycles, Ivison incurred out-of-pocket expenses including the ovary-stimulating medications, travel, hotels, and lost time at work; the services at Conceptions; and additional expenses to become pregnant through the use of a donor egg after none of her own eggs survived.

Extend now moves to dismiss the FAC.  It argues, first, that this Court lacks subject matter jurisdiction because the Consent Form limits recovery to the fees paid Extend, which is less than %75,000.  Second, it argues that the statute of limitations for the medical malpractice claim has expired, because the tolling agreements do not cover a claim of medical malpractice.  Next, Extend argues that the action must be dismissed pursuant to Rule 12(b)(7), Fed. R. Civ. P., because Ivison failed to include Conceptions, which it argues is a necessary party under Fed. R. Civ. P. 19.  Finally, Extend argues that all six of the claims are inadequately pled.

## Discussion

I.   Subject Matter Jurisdiction

The defendant in this diversity action moves pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss the FAC on the ground that it fails to plead the necessary amount in controversy.  This argument fails.

"The jurisdictional determination is to be made on the basis of the plaintiff's allegations, not a decision on the merits.  Moreover, even where those allegations leave grave doubt about the likelihood of recovery of the requisite amount, dismissal is not warranted."  Zacharia v. Harbor Island Spa, Inc., 684 F.2d 199, 202 (2d Cir. 1982).  Instead, to dismiss a case based on failure to satisfy the amount in controversy requirement, "it must appear to a legal certainty from the complaint that the plaintiff cannot recover sufficient damages to invoke federal jurisdiction."  Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 229 (2d Cir. 2017) (emphasis added).  As a result, "even if defendant's liability were [ultimately] limited" to an amount less than $75,000 based on a limitation of liability clause or other defense, "plaintiff would nevertheless have a live claim" in federal district court for that amount. Zacharia, 684 F.2d at 202.

The FAC alleges compensatory damages in excess of the jurisdictional amount, as well as punitive damages.  Extend nonetheless argues that there is no subject matter jurisdiction because the Consent Form limited any recovery to the amount paid to Extend, which was less than $75,000.  The record contains no Consent Form for the second retrieval cycle.  Plaintiff argues that the Consent Form, which has been provided for the first

retrieval cycle, is unenforceable because it is contrary to public policy and because it cannot be used to preclude recovery for gross negligence.  Because it does not appear to a legal certainty from the complaint that the amount in controversy is less than $75,000, Extend's motion to dismiss pursuant to Rule 12(b)(1) is denied.[2]

## II.  Indispensable Parties

Extend also seeks dismissal of this action under Rule 12(b)(7), Fed. R. Civ. P., contending that Conceptions is an indispensable party under Fed. R. Civ. P. 19.  This argument also fails.

Rule 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party.  Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 724 (2d Cir. 2000); Fed. R. Civ. P. 19(b).  First, the court must determine whether an absent party is a "necessary" party under Rule 19(a).  A party is "necessary" under Rule 19(a) where:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or

---

[2] Under New York law, whether a clause limiting liability is enforceable will depend, inter alia, on whether the claims sound in contract, whether the contract limiting liability was entered into by sophisticated parties, and whether the clause is exculpatory or limits recovery to nominal damages.  Matter of Part 60 Put-Back Litigation, 141 N.Y.S.3d 410, 416–18 (N.Y. 2020).

> (2) the person claims an interest relating to the
> subject of the action and is so situated that the
> disposition of the action in the person's absence may
>
> > (i)  as a practical matter impair or impede
> > the person's ability to protect that
> > interest or
> >
> > (ii) leave any of the persons already
> > parties subject to a substantial risk
> > of incurring double, multiple, or
> > otherwise inconsistent obligations by
> > reason of the claimed interest.

Fed. R. Civ. P. 19(a).

If a party does not qualify as necessary under Rule 19(a),
then a court need not decide whether its absence warrants
dismissal under Rule 19(b).  Viacom, 212 F.3d at 724.  But if a
court makes a threshold determination that a party is necessary
under Rule 19(a) and determines that joinder of the absent party
is not feasible, then the court must determine "whether, in
equity and good conscience, the action should proceed among the
existing parties or should be dismissed."  Fed. R. Civ. P.
19(b); see Viacom, 212 F.3d at 725.  The factors to be
considered by the court include: first, to what extent a
judgment rendered in the person's absence might be prejudicial
to the person or those already parties; second, the extent to
which, by protective provisions in the judgment, by the shaping
of relief, or other measures, the prejudice can be lessened or
avoided; third, whether a judgment rendered in the person's

absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.  Id.

The language of Rule 19(b) leaves a district court with "substantial discretion in considering which factors to weigh and how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed for a complete adjudication of the dispute." Envirotech Corp. v. Bethlehem Steel Corp., 729 F.2d 70, 75 (2d Cir. 1984) (citation omitted).  "[W]hether a particular lawsuit must be dismissed in the absence of [a necessary party] can only be determined in the context of particular litigation." Seneca Nation v. Hochul, 58 F.4th 664, 669 (2d Cir. 2023) (citation omitted).

Conceptions has not claimed an interest related to the subject of the action.  "It is the absent party that must claim an interest." Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 49 (2d Cir. 1996) (citation omitted).  Thus, Conceptions is not "necessary" under Rule 19(a) unless in its absence complete relief cannot be accorded between Ivison and Extend.  Fed. R. Civ. P. 19(a)(1)(A).

It has long been established that "it is not necessary for all joint tortfeasors to be named as defendants in a single

lawsuit." Temple v. Synthes Corp., Ltd., 498 U.S. 5, 8 (1990).
As the Advisory Committee Note to Rule 19 explains, a
"tortfeasor with the usual 'joint-and-several' liability is
merely a permissive party to an action against another with like
liability." Fed. R. Civ. P. 19 advisory committee's note to
1966 amendment; see also MasterCard Intern. Inc. v. Visa Intern.
Service Ass'n, Inc., 471 F.3d 377, 385 (2d Cir. 2006).

Extend argues that it will not have a fair opportunity to
defend itself unless Conceptions is joined as a party. As
Extend notes, Conceptions had exclusive possession of Ivison's
eggs for over a month, and had exclusive control over the
thawing process. These facts suggest a defense Extend may
present at trial. It will have an opportunity to take discovery
of Conceptions should it wish to do so. These facts do not,
however, make Conceptions a necessary party. Nor will they
prevent Extend from having an opportunity to defend itself.

III. Medical Malpractice

The FAC includes a claim for "medical negligence," which
the plaintiff treats as a claim of medical malpractice. Extend
moves to dismiss the claim of medical malpractice on the ground
that the services for which the plaintiff seeks recovery, which
do not include the retrieval of the oocytes, are not claims of
medical malpractice, and if they are properly pled as to medical

malpractice, they are untimely.  Extend's motion to dismiss this claim is granted.

Under New York law,[3] a claim sounds in medical malpractice when the challenged conduct constitutes "medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician."  Davis v. South Nassau Communities Hosp., 26 N.Y.S.3d 231, 242 (N.Y. 2015) (citation omitted).  The New York Court of Appeals has noted "that the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two."  Weiner v. Lenox Hill Hosp., 650 N.Y.S.2d 629, 631 (N.Y. 1996) (citation omitted).  Where "the challenged conduct was not linked to the medical treatment of a particular patient," however, the claim sounds in negligence and not medical malpractice.  Id. at 630.  Thus, a hospital's "failure to adopt and prescribe proper procedures and regulations" for the collection of blood, including testing and screening blood for HIV, sounded in negligence.  Id.

---

[3] Extend cites New York law in its briefing.  Ivison does not dispute that New York law applies to this action.  "[W]here the parties agree that [New York] law controls, this is sufficient to establish choice of law."  Insurance Company of the State of Pennsylvania v. Equitas Insurance Limited, 68 F.4th 774, 779 n.2 (2d Cir. 2023).

All of Ivison's claims stem from the alleged mishandling and/or loss of her successfully retrieved eggs, rather than from the retrieval process itself.  Indeed, the FAC alleges that Ivison underwent two successful egg retrieval cycles.  Ivison's claims therefore sound in ordinary negligence rather than medical malpractice, and the claim for medical malpractice is dismissed.

IV.  Failure to State a Claim

Extend has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the FAC on the ground that each claim is inadequately pled.  For the reasons discussed below, Extend's motion is denied as to the claims for negligence, gross negligence, and negligent infliction of emotional distress.  Extend's motion is granted as to the claims for fraud and breach of contract.

To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face."  Green v. Dep't of Educ. of City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Charles v. Orange County, 925 F.3d 73, 81 (2d Cir. 2019) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs." Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." Hamilton v. Westchester County, 3 F.4th 86, 91 (2d Cir. 2021) (citation omitted).

A.   Negligence

The defendant moves to dismiss the FAC's claim of negligence on the ground that the FAC does not provide adequate notice of the duty owed by Extend to Ivison.  The elements of a negligence claim under New York law are (i) the existence of a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.  See Dooley v. United States, 83 F.4th 156, 162 (2d Cir. 2023).

To determine the existence of a duty, a court considers "whether the relationship of the parties is such as to give rise to a duty of care." Id. (citation omitted).  Providers of healthcare-related services can have duties independent of those arising from physician-patient relationships.  New York courts have recognized, for example, a hospital's "independent duties as a blood-collection center" where a plaintiff brought a claim

17

for "failure to properly screen and test its blood supply."
Weiner, 650 N.Y.S.2d at 631-32; see also Bleiler v. Bodnar, 489
N.Y.S.2d 885, 890 (N.Y. 1985) (recognizing duty of hospital to
"adopt and prescribe proper procedures and regulations"); Landon
v. Kroll Laboratory Specialists, Inc., 977 N.Y.S.2d 676, 679
(N.Y. 2013) (drug testing laboratory had duty to perform drug
test in keeping with relevant professional standards).

The FAC adequately alleges that Extend had a duty to
safeguard Ivison's frozen eggs and transport them securely.  Its
allegations plausibly plead a breach of Extend's duty of
reasonable care.

B.   Gross Negligence

The defendant moves to dismiss the claim of gross
negligence on the ground that the FAC fails to plead intentional
wrongdoing or reckless indifference.  A claim for gross
negligence under New York law will survive "only if the
plaintiff alleges facts plausibly suggesting that the
defendant's conduct evinces a reckless disregard for the rights
of others or smacks of intentional wrongdoing."  Bayerische
Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d
42, 61 (2d Cir. 2012) (citation omitted); see Matter of Part 60
Put-Back Litigation, 141 N.Y.S.3d 410, 416 (N.Y. 2020).
"Recklessness in the context of a gross negligence claim means
an extreme departure from the standards of ordinary care, such

18

that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Bayerische Landesbank, (citation omitted). "Stated differently, a party is grossly negligent when it fails to exercise even slight care or slight diligence." Dolphin Holdings, Ltd. v. Gander & White Shipping, Inc., 998 N.Y.S.2d 107, 109 (App. Div. 2014) (citation omitted).

Dolphin Holdings is instructive. In that case, the owner of valuable artworks stated a claim for gross negligence where employees of an art packing and transporting business "failed to exercise even slight care by, among other things, placing two valuable works in close proximity to each other, in violation of the defendant's own policy and practice, and thereby causing the works to come in contact with each other." Id. The complaint also alleged that "defendant, by tearing the work either before or while packing it into a travel frame, failed to exercise even slight care." Id. Even though the complaint did not "set forth the exact manner in which the defendant damaged the work, taking into account that the defendant is in a better position to know the details and that the motion was made pre-answer, the pleading sufficiently identified the complained-of conduct, and set forth the material elements of a gross negligence cause of action." Id.

Here, Ivison alleges that Extend misplaced one of the straws and delivered another to Conceptions with no cap affixed. A fertility clinic that promises safe and secure storage of oocytes but that misplaces, even temporarily, those oocytes evinces a "reckless disregard" for that woman's rights. Likewise, where the device containing frozen human oocytes is missing its cap, "the danger was either known to [Extend] or so obvious that [Extend] must have been aware of it." Bayerische Landesbank, 692 F.3d at 61 (citation omitted). Extend's conduct in these regards may plausibly be said to have been "an extreme departure from the standard of ordinary care, most obviously because there is no apparent reason" why the cap would be missing from one of the straws. Id. at 62.

Ivison has thus plausibly pled a claim for gross negligence. Extend's motion to dismiss that claim is denied.

C.   Fraud

Extend moves to dismiss the FAC's claim of fraud on the ground that the FAC fails to plead specific facts indicating why the purported representations were fraudulent and fails to allege facts evincing a strong inference of fraudulent intent. It is correct.

A party alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). A fraud claim under New York law consists of five elements: "(1) a

material misrepresentation or omission of a fact, (2) knowledge

of that fact's falsity, (3) an intent to induce reliance, (4)

justifiable reliance by the plaintiff, and (5) damages."

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797

F.3d 160, 170 (2d Cir. 2015) (citation omitted).

Additionally, to meet Rule 9(b)'s heightened pleading

standard, the complaint must: (1) detail the events giving rise

to the fraud, such as the statement or omission that is alleged

to be fraudulent, the identity of the speaker, the location of

the fraud, and the reason the statement is fraudulent; and (2)

allege facts "that give rise to a strong inference of fraudulent

intent." Id. at 171; see also Cohen v. S.A.C. Trading Corp.,

711 F.3d 353, 359 (2d Cir. 2013). "An inference is strong if it

is cogent and at least as compelling as any opposing inference

one could draw from the facts alleged." Loreley Fin., 797 F.3d

at 176-77 (citation omitted). The requisite inference

> may be established either (a) by alleging facts to
> show that defendants had both motive and opportunity
> to commit fraud, or (b) by alleging facts that
> constitute strong circumstantial evidence of conscious
> misbehavior or recklessness.

United States v. Strock, 982 F.3d 51, 66 (2d Cir. 2020)

(citation omitted).

Ivison's allegations against Extend are not pled with the

requisite particularity. Ivison alleges that Extend

fraudulently induced her into entering into a contractual relationship by misrepresenting its services.  She further alleges that Extend "made false and fraudulent statements of material fact concerning the nature and quality of its services and terms and conditions on which these services were performed."  The "false and fraudulent statements or omissions of material fact" listed in the FAC merely rephrase the ways in which Ivison alleges Extend breached its duty of reasonable care.  They do not "give rise to a strong inference of fraudulent intent," Lorely Fin., 797 F.3d at 171, or "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Strock, 982 F.3d at 66.  Extend's motion to dismiss the fraud claim is granted.

D.   Breach of Contract

The defendant moves to dismiss the FAC's claim for breach of contract on the ground that the FAC does not identify specific contract terms that Extend allegedly violated.[4]  It is correct.

To plead a cause of action for breach of contract under New York law, a plaintiff must allege that (1) a contract exists;

---

[4] Under New York law, plaintiffs are generally prohibited from bringing duplicative contract and tort claims, see IKB International, S.A. v. Wells Fargo Bank, N.A. (197 N.Y.S.3d 719, 729 (N.Y. 2023)); however, the defendant did not make this argument.

(2) plaintiff performed in accordance with the contract; (3)
defendant breached its contractual obligations; and (4)
defendant's breach resulted in damages.  See 34-06 73, LLC v.
Seneca Insurance Company, 178 N.Y.S.3d 1, 7 (N.Y. 2022).
Further, the plaintiff's allegations must identify the
provisions of the contract that were breached.  Id. (citation
omitted).

The FAC alleges that Ivison spoke with Extend
representatives and agreed to pay Extend for its services in
retrieving, storing, and transporting her eggs.  It alleges
Extend breached its contract by "making warranties and promises
it could not or would not keep and by failing to provide the
services it represented."  But it does not point to specific
terms or provisions of any specific agreement entered into by
the parties, either written or oral.  Extend's motion to dismiss
the claim for breach of contract is granted.

E.   Negligent Infliction of Emotional Distress

Finally, the defendant moves to dismiss Ivison's claim for
negligent infliction of emotional distress on the ground that
the FAC fails to allege an identifiable physical injury.  To
plead a negligent infliction of emotional distress claim under
New York law, a plaintiff must allege "(1) a breach of a duty
owed to the plaintiff; (2) emotional harm; (3) a direct causal
connection between the breach and the emotional harm; and (4)

circumstances providing some guarantee of genuineness of the harm." _Francis v. Kings Park Manor, Inc._, 992 F.3d 67, 81 (2d Cir. 2021).

A breach of a duty of care resulting directly in emotional harm is compensable even though no physical injury occurred, so long as there is "an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious." _Baker v. Dorfman_, 239 F.3d 415, 421 (2d Cir. 2000) (citation omitted). Such special circumstances have included a hospital's negligently misinforming a woman that her mother had died.  _Id._

Such "special circumstances" exist here.  Where a defendant's negligence directly impacts a person's ability to conceive her own genetic offspring, there is an "especial likelihood of genuine and serious mental distress."  _Id._  The defendant's motion to dismiss the claim for negligent infliction of emotional distress is denied.

### Conclusion

Extend's September 8, 2023 motion to dismiss is granted in part.  Ivison's claims for fraud, breach of contract, and

medical malpractice are dismissed.

Dated:      New York, New York
            January 24, 2024

                                    _____
                                         DENISE COTE
                                    United States District Judge