```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
LAUREN IVISON,                          :
                        Plaintiff,      :
                                        :       23cv4503 (DLC)
             -v-                        :
                                        :       OPINION AND
EXTEND FERTILITY, LLC.,                 :          ORDER
                        Defendant.      :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiff Lauren Ivison:
Scott Martin Hendler
Stephen Daniel Demik
Leigh Joseph
Hendler Flores Law, PLLC
901 S. MoPac Expressway
Building 1, Suite 300
Austin, TX 78746

For defendant Extend Fertility, LLC:
Mark Frank McAndrew
Brian D. Meisner
Voute, Lohrfink, McAndrew, Meisner & Roberts
170 Hamilton Ave, Suite 315
White Plains, NY 10601

DENISE COTE, District Judge:

Lauren Ivison has brought an action against Extend
Fertility, LLC. ("Extend") alleging various state law claims,
some of which were dismissed in a prior Opinion of this Court.
Ivison v. Extend Fertility, LLC, 2024 WL 263461 (DLC) (S.D.N.Y.
Jan. 24, 2024).  Extend now moves to enforce a contractual
limitation of damages.  For the following reasons, the motion is
granted in part.

## Background

This Opinion addresses the enforceability of a liability limitation clause contained in a consent form signed by Ivison prior to an egg retrieval cycle.  It assumes familiarity with the prior Opinion issued in this case and summarizes only the facts necessary to rule on Extend's motion to enforce the contractual limitation of damages.  To support its motion, Extend has submitted the two documents that Ivison executed before receiving Extend's services.

In September 2018 and in January 2019, Ivison, a Colorado resident, travelled to New York to undergo two egg retrieval cycles with Extend, a fertility clinic.  She planned to use Extend's services for freezing, storing, and eventually transporting her eggs to Colorado for thawing and in vitro fertilization ("IVF").  An egg retrieval cycle involves a 1–2 week process, during which the patient takes medication to stimulate the ovaries to produce multiple eggs.  The process also involves multiple blood tests and transvaginal ultrasound exams.  A physician determines when the eggs are ready for retrieval, at which point they are surgically removed.  After the eggs are removed, Extend places them on a Cryotec straw, a thin film strip attached to a rigid plastic handle.  A lab technician submerges the straw in liquid nitrogen, which freezes the eggs onto the film.  The technician then manually screws a

cap over the film on the end of the straw, places the straw into
a tube, and stores the tube in a canister inside a liquid
nitrogen tank.  Extend keeps the liquid nitrogen tanks in its
lab until it decides to transfer them to New England Cryogenic
Center in Massachusetts ("NECC"), its long-term storage facility
partner.

Ivison began her first egg retrieval cycle on September 28,
2018.  Before beginning that cycle, on September 28, Ivison
signed a form titled "INFORMED CONSENT FOR OVARIAN STIMULATION,
EGG RETRIEVAL AND OOCYTE CRYOPRESERVATION (EGG FREEZING)"
("Consent Form").  The Consent Form explained the procedure and
noted that

> Freezing my eggs does not provide a guarantee that the
> eggs, once thawed, will result in an embryo or a
> viable pregnancy.  There is a risk that, should I
> choose to use my eggs in order to become pregnant,
> none of my eggs will survive the thawing procedure,
> fertilize normally, or develop into embryos.

The form also contained a section entitled "WHAT ARE THE
LEGAL CONSIDERATIONS?" which in turn contained two paragraphs.
The first (the "Release"), states as follows:

> I hereby agree to indemnify, hold harmless, not sue,
> and release the Extend Fertility Medical Practice and
> its physicians, employees, and contractors, and Extend
> Fertility LLC, and its officers, directors, trustees,
> employees, and agents from any and all liability or
> obligation of any kind whatsoever in any way connected
> with or related to my participation in this egg
> retrieval/freezing process.  This includes but is not
> limited to claims relating to: 1) failure to obtain

3

viable eggs; (2) <u>failure of the frozen eggs to survive</u>
<u>freezing or thawing</u> or to fertilize when thawed; (3)
failure to become pregnant; (4) pregnancy with
subsequent miscarriage; (5) complications of pregnancy
or labor and delivery; (6) disease or abnormalities
afflicting any children born as a result of this
process; or (7) any claim or legal action whatsoever
brought by an assignee or heir.

The second paragraph (the "Limitation Clause")

provides:

I understand that in the event of the loss, injury,
damage or destruction of my eggs by the failure to
exercise reasonable care by Extend Fertility Medical
Practice and its physicians, employees, and
contractors, and/or Extend Fertility LLC, and any of
its officers, directors, trustees, employees, or
agents, the total <u>liability</u> of Extend Fertility
Medical Practice <u>shall be the amount equal to the</u>
<u>total fees paid</u> to Extend Fertility Medical Practices
and the total liability of Extend Fertility, LLC shall
be the amount equal to the total fees paid to Extend
Fertility, LLC.

(emphasis supplied).  On October 12, Ivison underwent a

successful egg retrieval; the doctor noted he had cryopreserved

one oocyte.

On January 12, 2019, Ivison returned to New York from

Colorado to undergo the second egg retrieval cycle.  On January

25, before her doctor retrieved and cryopreserved two oocytes,

Ivison signed a form titled "DAY OF PROCEDURE CONSENT" ("January

Form").  The January Form stated:

I have previously reviewed and signed the Egg
Fertility Egg Freezing Consent and have had all my
questions satisfactorily answered.

> I am re-confirming my consent for the Ultrasound-
> Guided Transvaginal Oocyte Retrieval procedure which
> will be performed by Dr. Klein.  I have had the
> opportunity to ask any additional questions to the
> Doctor, and I understand the attendant risks,
> benefits, and alternatives.

The above language was followed by Ivison's dated

signature.  The physician's dated signature appeared below the

following language:

> The risks, benefits, and anticipated outcomes of the
> procedure(s), and the roles and tasks of the personnel
> to be involved were discussed with the patient.

The January Form did not contain any language purporting to

limit Extend's liability.  Ivison did not sign another form

before the January 25 procedure.

In January of 2020, Ivison began seeing a doctor at a

Colorado fertility clinic, Conceptions Reproductive Associates,

Inc. ("Conceptions"), to make plans for IVF.  Ivison contacted

Extend to request the transfer of her eggs to Conceptions in

Colorado for thawing and IVF.  Ivison completed the transfer

documents and paid Extend on March 4, 2020.

During the week of March 16, 2020, Conceptions called

Ivison and informed her that Extend had sent only one of the two

Cryotec straws, which Conceptions identified as containing just

one egg.  Ivison immediately contacted Extend and was told that

one of her two Cryotec straws had been misplaced by Extend.  She

was then told that Extend had found the second straw at its New York facility and had agreed to ship it to Conceptions.

Due to the pandemic, the thaw and fertilization procedure was delayed until May 28, 2020.  On that date, the embryologist at Conceptions told Ivison that she had no usable oocytes.  The embryologist informed Ivison that the cap of one of the straws was missing, and of the three expected oocytes, two simply "weren't there."  The embryologist used the same thawing process she had used at another clinic for 13 years, and said she "was very familiar with it," but had "no idea what happened," and said the eggs "just weren't there."  The one egg had degenerated during the thawing process.  Ivison's medical records from Conceptions note that the first straw

> was labeled to contain 1 oocyte.  Nothing was present
> on this [straw].  Second embryologist searched dish.
> The second [straw] was labeled to contain 2 oocytes.
> There was one oocyte on this [straw].  Second
> embryologist searched dish.  Unfortunately, this
> oocyte did not survive the warming process.

Ivison filed her complaint on May 30, 2023.  Extend filed a motion to dismiss the original complaint, and Ivison filed the First Amended Complaint ("FAC") on August 18.  Extend's renewed motion to dismiss was fully submitted on October 4.  An Opinion of January 24, 2024 granted in part Extend's renewed motion. Ivison, 2024 WL 263461.  Ivison's claims for fraud, breach of contract, and medical malpractice were dismissed.  Extend's

motion was denied as to Ivison's claims for negligence, gross negligence, and negligent infliction of emotional distress.

At a telephonic conference on February 8, counsel for Extend indicated that further briefing on the issue of the limitation of damages clause would help narrow the issues. Pursuant to an Order of February 8, discovery is ongoing. Extend's motion for an order declaring that the contractual limitation of damages is enforceable was fully submitted on April 5.

## Discussion

For the reasons that follow, the Consent Form is enforceable insofar as it limits any recovery for Ivison's claims for negligence and negligent infliction of emotional distress stemming from the first retrieval cycle to the amount paid for that cycle.  It is unenforceable against Ivison's claims for gross negligence and against any claims relating to the second retrieval cycle.

Under New York law, releases that "merely waive any and all claims arising in the future cannot be enforced because they fail to advise the signor that the waiver extends to claims that might arise from the defendant's own negligence." Rigney v. Ichabod Crane Cent. School Dist., 874 N.Y.S.2d 280, 282 (3d

Dep't 2009).[1]  Tortfeasors may, however, contract away their
liability for negligence:

> In the absence of contravening public policy,
> exculpatory provisions in a contract, purporting to
> insulate one of the parties from liability resulting
> from that party's own negligence, although disfavored
> by the law and closely scrutinized by the courts,
> generally are enforced, subject however to various
> qualifications.

Lago v. Krollage, 78 N.Y.2d 95, 99 (1991).

An exculpatory agreement directed to a party's negligence
will be enforced only if its language "expresses in unequivocal
terms the intention of the parties to relieve a defendant of
liability for its own negligence."  Sjogren v. Board of Trustees
of Dutchess Community College, 189 N.Y.S.3d 237, 239 (2d Dep't
2023) (citation omitted).  "Because exculpation provisions are
not favored by the law, they are strictly construed against the
party relying on them."  Ash v. New York University Dental
Center, 564 N.Y.S.2d 308, 310 (1st Dep't 1990).  Judicial
scrutiny of such provisions focuses on, inter alia, "the scope
and sufficiency of the language of the particular exculpatory
clause involved," including whether the clause fails to express

---

[1] As in its motion to dismiss, Extend cites New York law in its
briefing on this issue.  Ivison does not dispute that New York
law applies to this action.  "[W]here the parties agree that
[New York] law controls, this is sufficient to establish choice
of law."  Insurance Company of the State of Pennsylvania v.
Equitas Insurance Limited, 68 F.4th 774, 779 n.2 (2d Cir. 2023).

an intent to exculpate "with sufficient specificity or clarity."
Id.

Agreements that purport to "grant exemption from liability
for willful or grossly negligent acts" are "viewed as wholly
void."  Lago, 78 N.Y.2d at 100; see also Tauro v. Gait, 72
N.Y.S.3d 264, 266 (4th Dep't 2018).  Further, "where a special
relationship exists between the parties such that an overriding
public interest demands that such a contract provision be
rendered ineffectual," the agreement will also be void.  Lago,
78 N.Y.2d at 100.  Examples of such special relationships
include those between employers and their employees and between
common carriers and their passengers.  Ash, 564 N.Y.S.2d at 310.
New York courts have also long rejected agreements that seek to
insulate physicians from their negligence.  Given the "State's
interest in the health and welfare of its citizens, and also
because of the highly dependent (and thus unequal) relationship
between patient and health care provider," a waiver of liability
will not be enforced.  Rosenthal v. Bologna, 620 N.Y.S.2d 376,
378 (1st Dep't 1995); see also Ash, 564 N.Y.S.2d at 310, 311.

I.   Gross Negligence

Ivison's claim for gross negligence survives Extend's
motion to dismiss.  See Ivison, 2024 WL 263461, at *7-*8.
Extend concedes that limitations on liability are unenforceable
with respect to allegations of gross negligence.  Thus, Ivison

can pursue her claim for gross negligence regarding both retrieval cycles, without any limitations on Extend's liability.

I.   First Retrieval Cycle

Ivison argues that the Consent Form, which she executed before the first retrieval cycle, is void as against public policy because it seeks to exculpate not only Extend's activities in connection with the handling of her successfully retrieved egg but also the medical procedure in which the egg was retrieved.  Despite its overbreadth, the Limitation Clause in the Consent Form is enforceable against the negligence claims stemming from the first retrieval cycle.  In this lawsuit, all of Ivison's claims stem from the alleged mishandling and loss of her successfully retrieved eggs.  She does not allege negligence in connection with the retrieval process itself.

Here, the Consent Form's Release purports to "indemnify, hold harmless, not sue, and release" Extend and "its physicians, employees, and contractors . . . from any and all liability or obligation of any kind whatsoever in any way connected with or related to [Ivison's] participation in this egg retrieval/freezing process."  Thus, the Release applies to activities that sound in medical malpractice and to those that do not.  See Ivison, 2004 WL 263461, *6 (distinguishing between medical malpractice claims, which are not at issue here, and Ivison's negligence claims).  Similarly, the Consent Form's

10

Limitation Clause is broadly worded to apply to the failure to exercise reasonable care by Extend, its physicians and employees "in the event of the loss, injury, damage or destruction of my eggs."  Those negligent activities may, theoretically, include the medical treatment provided to Ivison during the retrieval process or to Extend's services in preserving, storing and transporting the egg after its retrieval.

The overbreadth of the Consent Form, including its Limitation Clause, does not void the entire agreement.  Even when an agreement contains an unlawful objective, it may be severed to preserve its lawful objectives.  Where an agreement "consists in part of an unlawful objective and in part of lawful objectives," a court may "sever the illegal aspects and enforce the legal ones, so long as the illegal aspects are incidental to the legal aspects and are not the main objective of the agreement."  Gover v. Savyon, 975 N.Y.S.2d 758, 760 (2d Dep't 2013)(citation omitted).

The Limitation Clause explicitly covers the post-retrieval activities of Extend and its employees even if it may also encompass medical treatment provided to Ivison.  It limits the amount Extend owes Ivison in the event of loss, injury, damage, or destruction of her retrieved eggs due to Extend's failure to exercise reasonable care.  As relates to the first retrieval,

the Limitation Clause expresses "the intention of the parties in unmistakable language" that is plain and precise.  Gross v. Sweet, 49 N.Y.2d. at 107.  It adequately advised Ivison "that the waiver extends to claims that might arise from the defendant's own negligence."  Lawrence v. North Country Animal Control Center, Inc., 5 N.Y.S.3d 558, 560 (3d Dep't 2015) (citation omitted).  The clause is therefore enforceable insofar as it relates to Extend's negligence and NIED claims stemming from the first retrieval cycle.

II.   Second Retrieval Cycle

The Consent Form's limitation liability clause is unenforceable against any claims stemming from the January retrieval cycle.  Exculpatory provisions are "strictly construed against the party relying on them."  Ash, 564 N.Y.S.2d at 310. Ivison signed the Consent Form on the first day of the first retrieval cycle.  The Consent Form refers to "this egg retrieval/freezing process" (emphasis added), not any future cycle.  In the "Overview" section at the beginning of the Consent Form, the form states that "[e]gg freezing involves taking medication for about 1–2 weeks," followed by the surgical removal and storage of the eggs.  Thus, "the language of the subject agreement does not clearly and unequivocally express the intention of the parties to relieve the defendant of liability" for any damages or injuries resulting from its negligence

12

relating to the second retrieval cycle.  Vella v. UBM Holdings,
Inc., 189 N.Y.S.3d 673, 675 (2d Dep't 2023).

Extend makes no developed argument that would lead to any
other conclusion.  It does not point to any language in the
Consent Form that would render it applicable to the January
retrieval cycle.  Nor does it point to any provision in the
January Form which clearly and unambiguously incorporates the
Consent Form and is effective in applying it to the January
retrieval cycle.  Extend's motion is therefore denied with
respect to claims stemming from Ivison's second retrieval cycle.

## Conclusion

Extend's March 1, 2024 motion is granted in part.  The
Consent Form's Limitation Clause applies to claims of negligence
and negligent infliction of emotional distress stemming from
Ivison's first retrieval cycle.

Dated:     New York, New York
           April 25, 2024

                                   _____
                                   DENISE COTE
                                   United States District Judge

13