UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:  9/30/2025

| | |
|---|---|
| LAUREN IVISON, | |
| Plaintiff, | 23-CV-4503 (BCM) |
| -against- | **OPINION AND ORDER** |
| EXTEND FERTILITY, LLC, | |
| Defendant. | |

**BARBARA MOSES, United States Magistrate Judge**

In this diversity action, plaintiff Lauren Ivison seeks damages from defendant Extend Fertility, LLC (Extend), a fertility clinic in New York, where she underwent two egg retrieval procedures in 2018 and 2019, resulting in the retrieval of a total of three oocytes. The oocytes were cryopreserved on two storage devices known as cryotops (or "straws") and, in 2020, were shipped to a fertility clinic in Colorado, plaintiff's state of residence, to be warmed and fertilized. The embryologist who performed the warming found no oocyte on the straw that was labeled to contain one oocyte, and found only a single degraded oocyte on the straw that was labeled to contain two oocytes. Plaintiff initiated this action against Extend on May 30, 2023, and her claims were narrowed, as a result of motion practice, in 2024. Now before the Court is defendant's motion (Dkt. 102) seeking summary judgment on plaintiff's three remaining claims: for negligence, gross negligence, and negligent infliction of emotional distress. For the reasons that follow, defendant's motion will be denied.

## I.    PROCEDURAL HISTORY

Plaintiff filed her initial Complaint (Dkt. 1) on May 30, 2023, followed by an Amended Complaint (Am. Compl.) (Dkt. 28) on August 18, 2023, seeking damages for negligence, medical negligence (malpractice), fraud and deceit, gross negligence, breach of contract, and negligent infliction of emotional distress. On September 8, 2023, defendant moved to dismiss the Amended

Complaint. (Dkt. 30.) On January 24, 2024, the Hon. Denise Cote, United States District Judge, granted the motion in part, dismissing plaintiff's claims for medical negligence, fraud, and breach of contract. *See Ivison v. Extend Fertility, LLC*, 2024 WL 263461, at *9 (S.D.N.Y. Jan. 24, 2024) (*Ivison I*).

On March 1, 2024, defendant filed a motion seeking an order enforcing a liability limitation clause contained in a consent form that plaintiff signed prior to her first egg retrieval cycle. (Dkt. 51.) On April 25, 2024, Judge Cote granted that motion in part, holding that the limitation clause applies to plaintiff's claims for negligence and negligent infliction of emotional distress stemming from that first cycle. *See Ivison v. Extend Fertility, LLC*, 2024 WL 1795411, at *5 (S.D.N.Y. Apr. 25, 2024) (*Ivison II*). Judge Cote denied the motion with respect to claims stemming from the second retrieval cycle. *Id.* at *4-5.

On June 13, 2024, the parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Dkt. 62.)

On January 27, 2025, after discovery, defendant filed its summary judgment motion, supported by a memorandum of law (Def. Mem.) (Dkt. 104); the declaration of attorney Brian D. Meisner (Meisner Decl.) (Dkt. 103), attaching 30 exhibits; and defendant's statement of undisputed material facts, filed pursuant to Local Civil Rule 56.1 (Def. 56.1 St.) (Dkt. 105). On March 17, 2025, plaintiff filed her opposition papers, including a memorandum of law (Pl. Opp.) (Dkt. 111); the declaration of attorney Leigh A. Joseph (Joseph Decl.) (Dkt. 110), attaching 22 exhibits; and plaintiff's responding Local Civil Rule 56.1 statement (Pl. 56.1 Resp.) (Dkt. 112). On March 31, 2025, defendant filed its reply brief (Def. Reply) (Dkt. 113), along with another declaration from attorney Meisner (Dkt. 114), attaching one additional exhibit.

## II.     FACTS

The following facts, which are undisputed unless otherwise noted, are taken from the parties' Local Civil Rule 56.1 statements, to the extent the facts stated therein are either admitted or not genuinely controverted; the underlying evidentiary materials; and other materials in the record or subject to judicial notice, as permitted by Fed. R. Civ. P. 56(c)(1)(A).

Extend is a reproductive services laboratory and facility located in New York, New York. Def. 56.1 St. ¶ 1; Pl. 56.1 Resp. ¶ 1. Plaintiff underwent two oocyte retrieval and cryopreservation procedures at Extend's facility on October 12, 2018, and January 25, 2019, when she was 39 years old. Def. 56.1 St. ¶ 3-4; Pl. 56.1 Resp. ¶ 3-4.

On September 28, 2018, before the first procedure, plaintiff signed a document entitled "Informed Consent for Ovarian Stimulation, Egg Retrieval and Ooycte Cryopreservation (Egg Freezing)." Meisner Decl. Ex. Y (Consent Form). The form included the following language:

> Reproduction Risks. Although oocyte cryopreservation is accepted as a safe and effective method of fertility preservation, some studies have shown that it may not be as effective at achieving a pregnancy as using a "fresh" (never frozen) oocyte in IVF. Freezing my eggs does not provide a guarantee that the eggs, once thawed, will result in an embryo or a viable pregnancy. There is a risk that, should I choose to use my eggs in order to become pregnant, none of my eggs will survive the thawing procedure, fertilize normally, or develop into embryos.

Consent Form § IV(1). The form continued:

> How Will My Frozen Eggs Be Stored? Extend Fertility, LLC will store my frozen eggs at Extend Fertility, 200 W 57th Street, Suite 1201, New York, NY 10019 for up to the first six months of storage beginning on the date of my egg retrieval procedure ("Initial Storage Period"), at no additional cost. At the time I sign this Consent, I must also elect a long term storage plan by signing a separate agreement (the "Long Term Storage Agreement") for how my frozen eggs w[ill] be stored after the Initial Storage Period.

*Id.* § V. Finally (as relevant here), the Consent Form contained the following limitation-of-liability language:

<u>What are the Legal Considerations?</u>
I hereby agree to indemnify, hold harmless, not sue, and release the Extend Fertility Medical Practice and its physicians, employees, and contractors, and Extend Fertility LLC, and its officers, directors, trustees, employees, and agents from any and all liability or obligation of any kind whatsoever in any way connected with or related to my participation in this egg retrieval/freezing process. This includes but is not limited to claims relating to: (1) failure to obtain viable eggs; (2) failure of the frozen eggs to survive freezing or thawing or fertilize when thawed; (3) failure to become pregnant; (4) pregnancy with subsequent miscarriage; (5) complications of pregnancy or labor and delivery; (6) disease or other abnormalities afflicting any children born as a result of this process; or (7) any claim or legal action whatsoever brought by an assignee or heir.

I understand and agree that in the event of the loss, injury, damage or destruction of my eggs by the failure to exercise reasonable care by Extend Fertility Medical Practice and its physicians, employees, and contractors, and/or Extend Fertility LLC, and any of its officers, directors, trustees, employees, or agents, the total liability of Extend Fertility Medical Practice shall be the amount equal to the total fees paid to Extend Fertility Medical Practices and the total liability of Extend Fertility, LLC shall be the amount equal to the total fees paid to Extend Fertility, LLC.

*Id.* § IX.

Plaintiff's first retrieval was performed on October 12, 2018, with Giselle Aguirre serving as the primary embryologist. Aguirre Dep. Tr. at 32:21-33:12.[1] Kimberly Gleason, Ph.D., served as the secondary embryologist for that retrieval. *Id.* at 33:25-34:11. The retrieval yielded a single mature oocyte for cryopreservation. Def. 56.1 St. ¶ 8; Pl. 56.1 Resp. ¶ 8; *see also* Meisner Decl.

---

[1] Both parties support their summary judgment papers with selected excerpts from various deposition transcripts. The transcripts themselves are scattered throughout the record. For simplicity's sake, this Opinion and Order cites each relevant transcript excerpt – uniformly – by the name of the witness and the page and line numbers of the pertinent testimony. The following key is provided for readers wishing to locate that testimony on the docket:

| | |
|---|---|
| Aguirre Dep. Tr. | Meisner Decl. Ex. L, Joseph Decl. Ex. 5 |
| Ivison Dep. Tr. | Meisner Decl. Exs. F, G; Joseph Decl. Exs. 1, 2 |
| Klein Dep. Tr. | Meisner Decl. Ex. H, Joseph Decl. Ex. 4 |
| LaRocque Dep. Tr. | Meisner Decl. Exs. I, J; Joseph Decl. Exs. 6, 7 |
| Proctor Dep. Tr. | Meisner Decl. Ex. K, Joseph Decl. Ex. 18 |
| Ramirez Dep. Tr. | Meisner Decl. Ex. M, Joseph Decl. Ex. 12 |
| Witt Dep. Tr. | Joseph Decl. Ex. 15 |

Ex. T (Extend cryopreservation record for 10/12/18 retrieval, noting that the retrieved egg was a "big oocyte"). The second retrieval, performed on January 25, 2019 by Joshua Klein, M.D., yielded two mature oocytes for cryopreservation, both of which were vitrified (frozen) on the same cryotop. Def. 56.1 St. ¶ 10; Pl. 56.1 Resp. ¶ 10; *see also* Meisner Decl. Ex. U (Extend cryopreservation record for 1/25/19 retrieval, noting that two oocytes were frozen on one straw). There is no evidence in the summary judgment record that plaintiff signed a new Consent Form prior to the second retrieval.

Plaintiff chose to have her eggs stored at New England Cryogenic Center (NECC), Extend's long-term storage partner. Klein Dep. Tr. at 75:9-11, 78:14-17. On March 7, 2019, plaintiff received an email from Jen Bernier at Extend, stating:

> We are reaching out to you to notify you that your eggs are now being stored safely at Extend Fertility's long-term storage facility managed by New England Cryogenic Center, Inc. Your eggs are well cared for and protected by our state-of-the-art, FDA-registered storage facility.
>
> As stated in your storage agreement, your eggs were stored safely at Extend Fertility for about six months after your initial retrieval and were then transferred to long-term storage where they will remain stored safely.

Joseph Decl. Ex. 9.

In 2020, plaintiff requested that all of her eggs be transferred to Conceptions Reproductive Associates of Colorado (Conceptions), a fertility clinic in her home state. On March 17, 2020, the straw from the October 2018 retrieval was received and accepted by Conceptions. Def. 56.1 St. ¶ 29; Pl. 56.1 Resp. ¶ 29. That same month (during "the first week of COVID"), plaintiff received a call from Conceptions, notifying her that Conceptions had received only one of the two cryotops. Ivison Dep. Tr. at 198:22-25; *see also*. Def. 56.1 St. ¶ 22 (only "[o]ne of the straws was at NECC when Ivison requested transfer to Conceptions.") (citing Klein Dep. Tr. at 90:10-12); Pl. 56.1 Resp. ¶ 22. Thereafter, plaintiff called Extend, which told her that the second cryotop was still "stored at

our facility," and that Extend would ship it to her at no cost. Ivison Dep. Tr. at 199:5-11. On April 9, 2020, the second straw – from the January 2019 retrieval – was received and accepted by Conceptions. Def. 56.1 St. ¶ 29; Pl. 56.1 Resp. ¶ 29. The form documenting receipt of the devices noted that, as to the straw from the January 2019 retrieval, there was "no cap on cryo tip." Meisner Decl. Ex. AA (Conceptions Oocyte Cryopreservation Form) at 1.

On May 28, 2020, Kimberly LaRocque, Ph.D., an embryologist at Conceptions, attempted to warm both straws. Def. 56.1 St. ¶ 30; Pl. 56.1 Resp. ¶ 30. No oocyte was found on the first straw (labeled to contain one oocyte). Def. 56.1 St. ¶ 33; Pl. 56.1 Resp. ¶ 33. During the thawing process, after Dr. LaRocque searched for (but was unable to locate) any oocyte, she took the cryo device out of the dish containing the thawing solution, placed it on the surface on which she was working, and went to seek assistance from another embryologist, Kalyn Trowbridge. LaRocque Dep. Tr. at 45:2-46:13. Trowbridge also could not find an oocyte in the dish. *Id*. at 46:24-47:5; *see also* LaRocque Dep. Tr. at 50:2-13. When Dr. LaRocque warmed the second straw (labeled to contain two oocytes), she immediately saw one egg, but not a second one. LaRocque Dep. Tr. at 50:23-25. The egg that was visualized was "degenerated," meaning "it did not survive." *Id.* at 51:1-8.

Conceptions memorialized these results on its Oocyte Cryopreservation Form (noting that there was "no oocyte" on the first straw and "1 oocyte," which was degenerated, on the second), and on plaintiff's patient chart.[2] Dr. LaRocque then personally notified plaintiff of her findings. LaRocque Dep. Tr. at 58:3-5; Ivison Dep. Tr. at 203:6-205:17. Plaintiff called Extend on the same

---

[2] The patient chart notes read: "Warmed oocytes received from extend fertility. The first cryotop was labeled to contain 1 oocyte. Nothing was present on this cryotop. Second embryologist searched dish. The second cryotop was labeled to contain 2 oocytes. There was one oocyte on this cryotop. Second embryologist searched dish. Unfortunately, this oocyte did not survive the warming process. Andrology notified to not thaw donor sperm vial. Dr. Greene notified and patient notified." Joseph Decl. Ex. 10 at ECF p. 5.

day, Ivison Dep. Tr. at 208:13, and ultimately spoke to a doctor and embryologist from Extend, who apologized and told her that they did not know what had happened. *Id.* at 208:23-210:11.

Following the loss of her oocytes, plaintiff experienced loss of appetite, anxiety, physical stress, interrupted sleep, and pain in her stomach and chest. Ivison Dep. Tr. at 67:17-68:6. In September 2020, she underwent a successful frozen embryo transfer, after which she gave birth to her first (non-genetic) child. *Id.* at 10:19-11:5; Def. 56.1 St. ¶ 40; Pl. 56.1 Resp. ¶ 40. When she sat for deposition in July 2024, plaintiff was pregnant with her second (non-genetic) child. Def. 56.1 St. ¶ 41; Pl. 56.1 Resp. ¶ 41.

## III.    LEGAL STANDARDS

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 323. "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party satisfies its initial burden, the burden shifts to the non-moving party to establish, through admissible evidence, a genuine dispute of material fact sufficient to prevent the entry of judgment against it. *Celotex*, 477 U.S. at 323-24; *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248; *see also id*. at 249 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

In this District, a party moving for summary judgment must submit a statement, in numbered paragraphs, setting forth "the material facts as to which [it] contends there is no genuine issue to be tried." Loc. Civ. R. 56.1(a). The opposing party must specifically controvert each numbered paragraph in a corresponding paragraph of its own. Loc. Civ. R. 56.1(b). If the opposing party fails to do so, that paragraph is deemed admitted. Loc. Civ. R. 56.1(c).

## IV.    DISCUSSION

### A.    Negligence

#### 1.    Legal Standard

To establish a prima facie case of negligence under New York law,[3] plaintiff must show "(i) the existence of a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Ivison I*, 2024 WL 263461 at *7 (quoting *Dooley v. United States*, 83 F.4th 156, 162 (2d Cir. 2023)). In *Ivison I*, Judge Cote held that plaintiff, whose claims "stem from the alleged mishandling and/or loss of her successfully retrieved eggs, rather than from the retrieval process itself," adequately alleged that defendant "had a duty to safeguard Ivison's frozen eggs and transport them securely." *Id.* at *6-7.

#### 2.    Breach of Duty

Extend does not dispute that it owed plaintiff a duty to safeguard her frozen eggs and transport them securely. Rather, it contends that there is no evidence that it breached this duty (notwithstanding that only one of plaintiff's three frozen eggs could be located when Conceptions

---

[3] The parties agree that New York law applies to all of plaintiff's remaining claims. *See* Def. Mem. at 7, 9; Pl. Opp. at 10, 12.

attempted to warm them for fertilization). Extend argues that its "handling and storage of Plaintiff's oocytes, were at all times within the standard of care." Def. Mem. at 11. Extend relies for this point primarily on its expert embryology witness, Murat Basar, Ph.D., who opined that Extend's "cryopreservation and vitrification procedures were performed without error," that the "training and experience of the embryologists at Extend was sufficient and in line" with relevant guidelines, and that Extend's "policies and procedures related to laboratory operations, [quality assurance/quality control], training of lab personnel, and the assessment and competency lab personnel, are all compliant with industry standards." *Id.* at 11-12 (citing Meisner Decl. Ex. Q (Basar Rep.)). Extend also contends that plaintiff's expert, Dr. Allen, offered no evidence that Extend "departed from the standard of care of good and accepted embryology laboratory practice, or that any negligence caused the loss of plaintiff's oocytes." *Id.* at 13. I disagree. As to this issue, the record reflects a genuine dispute of material fact as to defendant's training protocols and record-keeping, precluding summary judgment.

Plaintiff's first retrieval was performed by Aguirre under the supervision of Dr. Gleason, an experienced "per diem" embryologist. Aguirre Dep. Tr. at 32:21-33:12; Ramirez Dep. Tr. at 29:22-30:17, 64:23-65:2. Aguirre was still in training at the time of the retrieval, and was not "capable of performing the retrieval independently." Pl. R. 56.1 Resp. ¶ 82; *see also* Klein Dep. Tr. at 119:22-24 ("Q: Are you telling me that on October 12th, 2018, Giselle Aguirre was fully trained and capable to do the retrieval on her own? A: No. I don't think she was.").

Extend's embryology expert, Murat Basar, Ph.D., opined that Extend's "practice of supervised procedures is a standard and entirely acceptable method in IVF laboratories, ensuring patients' highest level of care and safety while maintaining rigorous training standards." Basar Rep. at 4. Dr. Basar further opined that Extend "demonstrated sufficient training," and that Extend's

policies and procedures, including those concerning "training of lab personnel," were all "compliant with industry standards." *Id*. at 4-6.

Plaintiff, for her part, does not contest that Gleason had years of general experience as an embryologist. *See* Ramirez Dep. Tr. at 30:19-23 ("Kim Gleason . . . I'm pretty sure she has more than 25 years of experience. She . . . has been the lab director for big programs. I mean, she's probably one of the most experienced embryologists in this field."). Nor does she deny that Extend *had* policies and procedures, including protocols for oocyte vitrification and recordkeeping. However, plaintiff notes that defendant did not produce any records showing that Gleason in particular received any training regarding Extend's protocols. *See* Pl. Opp. at 15-16, 19 (explaining that plaintiff requested such documents during discovery but that Extend "produced absolutely no records"); Joseph Decl. Ex. 13, at 3 (defendant's response to plaintiff's document requests, objecting to her request for Gleason's "training or other onboarding records" as vague and ambiguous and stating that defendant "does not maintain" any responsive documents).

Plaintiff further notes that Leslie Ramirez (Extend's assistant laboratory supervisor at the relevant time) gave inconsistent testimony concerning Gleason's onsite training. Asked whether she remembered "going through written protocols with [Gleason] for how to perform a vitrification," Ramirez responded, "Yeah. With . . . every person that went to the laboratory, we went through . . . every procedure. We explained them. We didn't assume anything. Like, there are multiple types of protocols. So you want just always to make sure that people are familiar with what you have or if they have done it before. So yeah, . . . when someone comes to that laboratory, you never assume anything. You have to go over everything with each person." Ramirez Dep. Tr. at 31:13-21. But when Ramirez was asked whether she had "a specific recollection of looking at written protocols with Kim Gleason," she responded, "I don't remember. I don't remember looking

10

exactly, like, the protocols with her. But it – it was – I mean, the – the binders were there. People review them." *Id.* at 31:22-32:1. On this basis, plaintiff argues that "there is a fact question as to what training (and when) Gleason received at Extend prior to supervising the vitrification and retrieval of [plaintiff's] eggs with an untrained junior embryologist, as well as what the potential impact of that was on the cryopreservation process, storage, documentation of the chain of custody, and transfer of [plaintiff's] eggs." Pl. Opp. at 19.

Dr. Basar made light of these gaps, writing that "[i]t is not unusual for a fertility center to not have training records for such an experienced embryologist." Basar Rep. at 5. But plaintiff's embryology expert, Christine Allen, Ph.D., opined that, absent training on specific "laboratory policies and procedures" used by Extend, even extensive experience as an embryologist "would not prevent operational errors," potentially including using "a different vitrification technique than the process used at that particular laboratory" or "labeling the samples in a standard way that could not be identified easily when looked for, or placing samples in an inappropriate tank by mistake." Joseph Decl. Ex. 11-2 (Allen Rep.) at 8.

There is also mixed evidence concerning Extend's quality assurance and quality control procedures, including its chain-of-custody documentation. Dr. Basar opined that "at each critical step – from the initial retrieval to the cryopreservation and subsequent storage of the plaintiff's oocytes – Extend Fertility enforced double checks for identification." Basar Rep. at 7. He added that "[t]he deposition testimonies of Giselle Aguirre and Leslie Ramirez not only corroborate that these protocols were strictly followed, but also highlight Extend Fertility's unwavering commitment to maintaining compliance with good laboratory practice standards for traceability and sample integrity." *Id*. at 7. But plaintiff's expert, Dr. Allen, disagreed. After reviewing the same deposition testimony, Dr. Allen opined that there were no "correct ID checks completed by

Extend Fertility staff at the time of shipment to NECC, no required double ID by two embryologists, and this lack of quality control may have led to the wrong . . . number of samples shipped, or even the wrong samples shipped on that day." Allen Rep. at 10.

It is true, as defendant argues, that Dr. Allen has not offered evidence "establishing that Extend departed from the standard of care of good and accepted embryology laboratory practice[.]" Def. Mem. at 13. But a plaintiff need not "establish" negligence to survive summary judgment. Through her expert testimony (the admissibility of which defendant has not challenged), Dr. Allen has raised more than a "metaphysical doubt" as to Extend's compliance with the standard of care, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), particularly with regard to the training of the two embryologists assigned to plaintiff's first egg retrieval and defendant's chain-of-custody protocols. Plaintiff has therefore satisfied her burden of showing that there is a genuine dispute of material fact as to the second element of her negligence claim.[4]

---

[4] The Court reaches this conclusion without considering the supplemental expert declaration of Dr. Allen (Allen Decl.) (Joseph Decl. Ex. 11), submitted by plaintiff along with her summary judgment opposition papers, in which Dr. Allen "clarifies" her deposition testimony in several respects. Allen Decl. ¶ 4. If any clarification was needed, Dr. Allen had 30 days after the receipt of her deposition transcript to make the desired changes. Fed. R. Civ. P. 30(e)(1)(B). Likewise, if at trial Dr. Allen wishes to explain that during her deposition she used the word "qualified" to mean "meeting the minimum educational qualifications" (rather than "competent," *see* Allen Decl. ¶ 7) she may do so. But summary judgment is not the time for a party to expand on (or modify) the testimony of a retained expert witness, particularly where, as here, that expert has produced a written report; has already amended it once (with leave of Court, *see Ivison v. Extend Fertility, LLC*, 2024 WL 4663039 (S.D.N.Y. Nov. 4, 2024)); has testified at deposition; and has passed up the opportunity to make changes to the transcript of her testimony pursuant to Rule 30(e)(1)(B). *See generally Sandata Techs., Inc. v. Infocrossing, Inc.*, 2007 WL 4157163, at *6 (S.D.N.Y. Nov. 16, 2007) ("[E]xperts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions. If that were the case, there would never be any closure to expert discovery, and parties would need to depose the same expert multiple times.").

### 3. Causation

Under New York law, a negligence plaintiff must establish both cause-in-fact (sometimes known as "but for cause") and proximate cause. *Wimbledon Fin. Master Fund Ltd. v. Bienert Miller & Katzman, PLC*, 678 F. Supp. 3d 417, 427 (S.D.N.Y. 2023) (citing *Aegis Ins. Servs. Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013)). To satisfy the cause-in-fact requirement, the plaintiff must prove that the injury would not have occurred but for the defendant's conduct. *Id*. To satisfy the proximate cause requirement, she must prove that the defendant's conduct was a "substantial cause of the events which produced the injury." *Dooley*, 83 at 162.

### a. Cause-in-fact

Extend argues that it has "conclusively established" the culpability of Dr. LaRocque – the embryologist at Conceptions who attempted the thaw of plaintiff's oocytes – and, relatedly, has shown that Dr. LaRocque's actions (not any misconduct by Extend) were the "likely cause of the loss of plaintiff's oocytes." Def. Mem. at 24-25. Defendant relies for this point on the testimony of LaRocque herself, as well as the testimony of another Conceptions embryologist, Glenn Proctor. *Id*. (Both LaRocque and Proctor were disclosed by plaintiff as "unretained experts." *See* Meisner Decl. Ex. N.)

At deposition, Dr. LaRocque explained that typically, during the thawing process, "[i]f the frozen material is not visualized immediately upon plunge of the cryo device, you don't even take your cryo device out while you're searching. You keep that in while you're searching the device and the surrounding media at the same time because just in case your embryo or egg still happens to be on the device, you don't want to withdraw it from the media." LaRocque Dep. Tr. at 62:15-24. In this case, according to LaRocque, she was unable to see any oocytes during the thawing

process of the first cryo device, at which point, in order to seek assistance from another embryologist, she took the cryo device out of the thawing solution and placed it on the surface on which she was working. LaRocque Dep. Tr. at 45:2-46:13. Dr. LaRocque acknowledged that if there had been any eggs on the cryo device (which she had overlooked), they "would not have been located" once she took the device out of the solution. *Id.* at 46:14-20. Similarly, Proctor testified that pulling the cryo device out of the solution – without first searching both sides of the device – would be a departure from the standard of care, Proctor Dep. Tr. at 93:8-23, and that if an oocyte were stuck to the device, it would be destroyed once the device was lifted from the solution. *Id.* at 93:24-94:15.

From this testimony, Extend concludes that "the culpability of a third party has been conclusively established," Def. Mem. at 25, because "LaRocque departed from her own protocol by removing the device from the thawing solution while the search continued." *Id.* at 24. Plaintiff responds that the evidence points to culpability by Extend, not Conceptions, noting that the second cryotop arrived at Conceptions without its protective top. Pl. Opp. at 24-25; *see also* Conceptions Oocyte Cryopreservation Form at 1 (noting lack of cap); LaRocque Dep. Tr. at 42:25-43:7 (confirming lack of cap); *id.* at 106:14-17 (testifying that it was "concerning that the protocol isn't followed"). Although Proctor did not offer an opinion as to whether the missing cap had any impact on the outcome of the process, *see* Proctor Tr. at 175:11-19, Dr. Klein testified that, while "[t]he cap does not hold the egg in," it may "protect any sort of physical damage to the end of the straw from bumping into something"), Klein Dep. Tr. at 98:18-23.

Additionally, plaintiff argues that "[t]he devices were clear so any eggs would have been seen on them." Pl. Opp. at 25. This is consistent with Dr. LaRocque's testimony that "the device is clear," so "it's pretty easy to see an egg or an embryo on the device itself"). LaRocque Dep. Tr. at

132:18-19. According to LaRocque, she searched both devices "thoroughly" before she removed them from the solution, and was confident that there were no eggs remaining on either of them when she took them out of the dish and set them down. *Id.* at 131:25-132:5. "Regardless," plaintiff concludes, "to the extent Extend blames Conceptions, this, again, is a question for the jury to decide." Pl. Opp. at 25.

Plaintiff is correct that there is a triable issue of fact as to but-for causation. Defendant's theory – that Dr. LaRocque likely lost two of plaintiff's three eggs when she removed the cryo devices from the dish after she searched them and could not find the missing eggs – is far from "conclusive." Although Extend is free to put that theory to the jury, plaintiff will also be permitted to argue that the eggs were lost, by Extend, before the straws ever got to Conceptions.

### b.    Proximate Cause

As to proximate cause, defendant contends that it is entitled to summary judgment because plaintiff "has not proffered any evidence showing that her chance[] of achieving a successful pregnancy was substantial." Def. Mem. at 22. Relying on the report of its fertility expert Barry R. Witt, M.D., *see* Meisner Decl. Ex. R (Witt Rep.), Extend argues that in light of plaintiff's "age-related fertility decline" and poor response to follicular stimulation protocols, her chance of a successful pregnancy (without the use of donor eggs) was so low that "the outcome in this case would most likely have been no different had all three oocytes been identified after the thaw." Def. Mem. at 22. Defendant adds that since plaintiff has not proffered any contrary expert evidence, "there is no ambivalence in the proof about whether there was a substantial loss of chance." *Id.*

As plaintiff correctly notes, however (*see* Pl. Opp. at 21-22), defendant's arguments are virtually identical to those twice rejected by the New York Appellate Division on strikingly similar facts. In *Bledsoe v. Ctr. for Hum. Reprod*, 228 A.D.3d 96, 98, 207 N.Y.S.3d 519, 519-20 (1st Dept

2019), plaintiff underwent in vitro fertilization (IVF) in advance of a course of chemotherapy, followed by cryopreservation of the resulting embryos. When the embryos were thawed, two were missing, three were degraded, and the remaining four embryos did not result in a pregnancy. *Id.* Sued for negligence, defendants argued that since "the chances of plaintiffs achieving a successful pregnancy at Ms. Bledsoe's age was as low as 11.1%," even in "healthy, non-cancer patients," "no act or omission by them deprived plaintiffs of the chance of a successful pregnancy." 228 A.D.3d at 103, 207 N.Y.S.3d at 523. The trial court agreed, but the appellate court reversed and remanded for trial, noting that "this low probability does not mean that any further decrease in probability was insubstantial or inconsequential," *id.*, particularly since "[t]he loss of the other embryos diminished plaintiffs' chances of a successful IVF implantation by over 50%." *Id.* Similarly, in *Roeser v. Essig*, 177 A.D.3d 502, 503, 112 N.Y.S.3d 71, 72 (1st Dept 2019), defendants won summary judgment on the ground that they could not be liable in negligence to plaintiff because even if they had offered her corrective surgery for her uterine condition, her "chance of achieving a successful pregnancy was less than 5%." The appellate court reversed and remanded, explaining that the trial court "improperly assume[d] that because plaintiff's chances were already less than 5%, any further decrease was inconsequential. However, it is for a jury to determine whether any reduction in plaintiff's chances of achieving a successful pregnancy was 'substantial.'" *Id.*

In its reply brief, Extend argues that plaintiff's reliance on *Bledsoe* is "misplaced" because in this case it has been "established" that "the plaintiff's chances of a successful [pregnancy] were 'unlikely,' not just 'low.'" Def. Reply at 8; *see also* Witt Rep. at 4 (estimating that plaintiff had a "1-2% chance of live birth" even if two of her three eggs had not been lost). The Court is not persuaded. Plaintiff's chance of a successful pregnancy, even if only 1-2%, was not zero, *see* Witt Dep. Tr. at 72:17-73:2. Moreover, the loss of two of her three eggs reduced that chance by two-

thirds. Under clear New York precedent, it is for the jury to determine whether that reduction was "substantial." *Bledsoe*, 228 A.D.3d at 103, 207 N.Y.S.3d at 523; *Roeser*, 177 A.D.3d at 503, 112 N.Y.S.3d at 72.

### B.    Gross Negligence

#### 1.    Legal Standard

A claim of gross negligence under New York law requires proof of: (1) a duty; (2) a breach of that duty; (3) an injury; and (4) "conduct [that] evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, 2021 WL 2582132, at *8 (S.D.N.Y. June 23, 2021) (alteration in original) (quoting *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012)). "[T]o prevail on a claim for gross negligence under New York law, a plaintiff must demonstrate that the defendant owed the plaintiff a duty and the defendant failed to exercise even slight care in the discharge of that duty." *Condoleo v. Guangzhou Jindo Container Co.*, 427 F. Supp. 3d 316, 335 (E.D.N.Y. 2019) (internal quotation marks and citation omitted). Gross negligence differs both in kind and degree from ordinary negligence, and "is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24, 611 N.E.2d 282, 284 (1993). "[C]ourts in this district have required that a defendant's conduct be particularly egregious in order to constitute gross negligence." *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, 2018 WL 6444934, at *7 (S.D.N.Y. Dec. 10, 2018) (collecting cases).

#### 2.    Analysis

Extend argues that plaintiff's gross negligence claim fails at summary judgment because plaintiff "has not established that defendant's conduct amounted to ordinary negligence, let alone

gross negligence." Def. Mem. at 22. As discussed above, plaintiff is entitled to proceed on her negligence claim, because there are genuine disputes of fact as to whether Extend breached its duty and whether its conduct caused plaintiff's injuries, precluding summary judgment. Therefore, in assessing plaintiff's gross negligence claim, the question becomes whether the summary judgment record contains evidence from which a jury could find "conduct [that] evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing."

At the motion to dismiss stage, Judge Cote concluded that the actions of Extend, as alleged in the Amended Complaint, rose to the level of gross negligence. *Ivison I*, 2024 WL 263461 at *8. First, Judge Cote explained, "[a] fertility clinic that promises safe and secure storage of oocytes but that misplaces, even temporarily, those oocytes evinces a 'reckless disregard' for that woman's rights." *Id.* Second, she reasoned, "where the device containing frozen human oocytes is missing its cap, 'the danger was either known to [Extend] or so obvious that [Extend] must have been aware of it.'" *Id.* (alteration in original) (citing *Bayerische Landesbank*, 692 F.3d at 61). That ruling is now the law of the case.

Moreover, the summary judgment record now supports plaintiff's relevant factual allegations. On March 7, 2019, Extend notified plaintiff by email that:

> [Y]our eggs are now being stored safely at Extend Fertility's long-term storage facility managed by New England Cryogenic Center, Inc. Your eggs are well cared for and protected by our state-of-the-art, FDA-registered storage facility.
>
> As stated in your storage agreement, your eggs were stored safely at Extend Fertility for about six months after your initial retrieval and were then transferred to long-term storage where they will remain stored safely.

Joseph Decl. Ex. 9. However, in 2020, after plaintiff requested that both straws be transferred to Conceptions in Colorado, only one (initially) arrived. Ivison Dep. Tr. at 198:22-25. This was because, notwithstanding Extend's assurances, only one of the straws was "stored safely" at NECC.

*See* Def. 56.1 St. ¶ 22 (citing Klein Dep. Tr. at 90:10-12); Pl. 56.1 Resp. ¶ 22. The other straw was still at Extend. Ivison Dep. Tr. at 199:5-11. There is thus admissible evidence before the Court showing that Extend at least "temporarily" misplaced some of plaintiff's ooyctes. Likewise, the record now supports plaintiff's claim that the straw labeled to contain two of plaintiff's oocytes was missing its protective cap when it was received by Conceptions. *See* Conceptions Oocyte Cryopreservation Form at 1; LaRocque Dep. Tr. at 42:25-43:7, 106:14-17. Since plaintiff has provided at least some evidence of "conduct [that] evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing," *PRCM Advisers*, 2021 WL 2582132 at *8, defendant is not entitled to summary judgment on her claim for gross negligence.

### C.    Negligent Infliction of Emotional Distress

As Judge Cote explained in *Ivison I*, "to plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege '(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm.'" 2024 WL 263461 at *9 (quoting *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021)).

In New York, a plaintiff may establish these elements in three ways. *See Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000). The first two are "obviously inapplicable" here, *id.*, as they require proof that defendant negligently exposed the plaintiff to "an unreasonable risk of bodily harm," or "unreasonably endangered" plaintiff's physical safety. *Id.* (citations omitted).

The third theory – potentially applicable here – "recognizes that when there is a duty owed by defendant to plaintiff, breach of that duty resulting directly in emotional harm is compensable even though no physical injury occurred." *Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504, 448 N.E.2d 1332, 1334 (1983). Thus, "recovery for emotional harm to one subjected directly to [a]

tortious act may not be disallowed so long as the evidence is sufficient to show causation and substantiality of the harm suffered, together with a 'guarantee of genuineness[.]'" *Johnson v. State*, 37 N.Y.2d 378, 383-84, 334 N.E.2d 590, 593 (1975) (holding that "[t]he daughter of a hospital patient may recover for emotional harm sustained by her as a result of negligent misinformation given by the hospital that her mother had died"); *see also Howard v. Lecher*, 42 N.Y.2d 109, 111-12, 366 N.E.2d 64, 65 (1977) ("[T]here may be recovery for the emotional harm, even in the absence of fear of potential physical injury, to one subjected directly to the negligence of another as long as the psychic injury was genuine, substantial, and proximately caused by the defendant's conduct."); *Martinez v. Long Island Jewish Hillside Med. Ctr.*, 70 N.Y.2d 697, 699, 512 N.E.2d 538, 539 (1987) (plaintiff could recover for emotional distress where defendants breached duty owed directly to her by erroneously advising her that her baby would be born with birth defects, leading her to obtain an abortion despite her belief that abortion was in most circumstances a sin).

In *Ivison I*, Judge Cote explained that, under New York law, "[a] breach of a duty of care resulting directly in emotional harm is compensable even though no physical injury occurred, so long as there is 'an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious.'" 2024 WL 263461 at *9 (quoting *Baker*, 239 F.3d at 421). Judge Cote then held that "[s]uch 'special circumstances' exist here" because, "[w]here a defendant's negligence directly impacts a person's ability to conceive her own genetic offspring, there is an 'especial likelihood of genuine and serious mental distress.'" *Id.* (quoting *Baker*, 239 F.3d at 421).

Hoping for a different result on summary judgment, defendant argues that New York law requires plaintiff to either demonstrate that defendant endangered plaintiff's physical safety or caused her to fear for her safety. *See* Def. Mem. at 23-24; Def. Reply at 9-10. However, defendant

ignores the "third theory" line of cases, discussed above, and instead relies on inapposite caselaw. For example, defendant cites *Johnson v. Jamaica Hospital*, 62 N.Y.2d 523, 467 N.E.2d 502 (1984) for the proposition that a negligent infliction of emotional distress claim cannot be sustained where an individual claims emotional distress as a result of learning unwelcome but truthful news. *See* Def. Mem. at 23-24. In *Johnson*, the Court of Appeals held that the plaintiffs could not state a claim for their own emotional distress caused by learning that their infant was abducted from the hospital's nursery. 62 N.Y.2d at 525, 467 N.E.2d at 502. The Court's analysis hinged on the fact that the hospital did not owe a duty to the parents, only to the infant. 62 N.Y.2d at 526-528, 467 N.E.2d at 503-04. Here, Extend owed a direct duty to plaintiff. *Johnson* is therefore inapposite.

Defendant's reliance on *Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146 (2d Dept 1986), a legal malpractice case, is similarly misplaced. In *Green*, the Appellate Division rejected plaintiff's contention that "recovery may be had for the negligent infliction of emotional distress whenever a direct duty to the plaintiff is owed and a breach of that duty results in emotional injury." 118 A.D.2d at 757, 500 N.Y.S.2d at 148. The court reasoned that though a physical injury was no longer a necessary element of a negligent infliction of emotional distress claim in New York, a plaintiff's physical safety must have been endangered. *Id.* However, as later explained in *Perrin v. Hilton International., Inc.*, 1992 WL 396221 (S.D.N.Y. Dec. 21, 1992), *Green* was at odds with *Johnson* and other decisions of the Court of Appeals, allowing negligent infliction of emotional distress claims in a wider range of cases. *Id.* at *3-5 (collecting cases).

Defendant also cites *Colorado Capital Investments, Inc. v. Owens*, 304 F. App'x 906 (2d Cir. 2008) (summary order), in which the Second Circuit held that "plaintiff's failure to show that defendant endangered his physical safety or caused him fear for his physical safety is fatal to his claim," *id.* at 908, but made this point *only after* concluding that there was an "absence of any

special circumstances in this case that raise a likelihood of genuine and serious mental distress and that guarantee that the claim is not spurious." *Id*. (cleaned up). Here, as Judge Cote determined, plaintiff adequately alleged the requisite "special circumstances." *Ivison I*, 2024 WL 263461 at *9.

Finally, defendant relies on *Lally v. Klick USA, Inc.*, 2025 WL 786576 (S.D.N.Y. Mar. 11, 2025), in which the court dismissed a claim of negligent infliction of emotional distress stemming from the timing of defendants' termination of plaintiff's employment (while she was taking an approved "'mental health day' tending to her disability"). *Id*. at *4. In the course of its opinion, the *Lally* court stated, in *dicta*, that "a cause of action to recover damages for negligent infliction of emotional distress generally must be premised upon the breach of a duty owed to the plaintiff which either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety." *Id*. at *6 (quoting *Lea v. McNulty*, 227 A.D.3d 971, 973, 212 N.Y.S.3d 152, 156 (2d Dep't 2024)). The *holding* of the case, however, was that the claim failed because plaintiff did not "allege a duty owed to her by Defendants or any breach of that duty." *Id*. at *7.

Given that defendant owed a direct duty of care to plaintiff, and given that – as Judge Cote explained – "'special circumstances' exist here," because defendant's alleged negligence "directly impact[ed] a person's ability to conceive her own genetic offspring," *Ivison I*, 2024 WL 263461 at *9, the question on summary judgment is simply whether plaintiff has proffered admissible evidence of "genuine and serious mental distress" arising from those special circumstances. *Id*.

Plaintiff testified that she "always thought [she] wanted probably two or three children," Ivison Dep. Tr. at 80:17-18, and wanted "nothing more than to have a biological family," *id*. at 107:17-18. Although she was aware of the risk that none of her eggs would "survive the thaw" or result in a viable pregnancy, Def. 56.1 St. ¶ 24; Pl. 56.1 Resp. ¶ 24; *see also* Consent Form § IV(1), she testified that Dr. LaRocque's phone call, informing her that "the eggs were not there," "is seared

in my body." Ivison Dep. Tr. at 203:10-22. Plaintiff "was really in shock." *Id.* at 212:2. As a result of the loss of the eggs, she suffered "loss of appetite, anxiety, physical stress, [and her] sleep was interrupted." *Id.* at 67:17-19. Additionally, plaintiff experienced "pain in [her] stomach[, . . . ] pains in [her] chest, the heaviness, all the things that go along with trauma[.]" *Id.* at 68:1-6. Plaintiff saw her psychotherapist for these symptoms. *Id.* at 68:8-12.

If the jury were to find for plaintiff on one of her negligence claims, and if that jury fully credited her testimony as to her emotional response to the loss of her eggs, it could rationally find that defendant's negligence caused "genuine and serious mental distress" to plaintiff, arising from "special circumstances," *Ivison I*, 2024 WL 263461, so as to support an award of damages for negligent infliction of emotional distress. Consequently, defendant is not entitled to summary judgment on this claim.[5]

## V.    CONCLUSION

For these reasons, defendant's motion for summary judgment (Dkt. 102) is DENIED. The parties are directed to submit their proposed Joint Pretrial Order, in accordance with this Court's Individual Practices, no later than **November 7, 2025**, along with a joint letter setting out their availability for trial during January or February 2026.

Dated: New York, New York
         September 30, 2025                     **SO ORDERED.**

                                               **BARBARA MOSES**
                                               **United States Magistrate Judge**

---

[5] Plaintiff remains bound by the limitation-of-liability clause in the Consent Form that she executed prior to the first retrieval, procedure. *See Ivison II*, 2024 WL 1795411, at *4-5 (S.D.N.Y. Apr. 25, 2024). Thus, in order to recover damages in excess of the fees she paid to Extend, *see* Consent Form § IX, plaintiff must succeed on her gross negligence claim or on one of her claims arising from the second retrieval procedure.

23